J.A. JONES CONSTRUCTION COMPANY, APPELLANT, *v.* LEHRER McGOVERN BOVIS, INC.; AND NATIONAL FIRE INSURANCE COMPANY OF HARTFORD, RESPONDENTS.

No. 39235

May 19, 2004                                    89 P.3d 1009

[Rehearing denied August 26, 2004]

[En banc reconsideration denied November 4, 2004]

*Haney, Woloson & Mullins* and *Wade B. Gochnour* and *Dennis R. Haney,* Las Vegas; *Braude & Margulies, P.C.,* and *Herman M. Braude,* Washington, D.C., for Appellant.

*Harrison Kemp & Jones, LLP,* and *Kirk R. Harrison* and *Richard F. Scotti,* Las Vegas, for Respondents.

*Jolley Urga Wirth & Woodbury* and *L. Christopher Rose* and *Roger A. Wirth,* Las Vegas; *Kegler, Brown, Hill & Ritter* and

---

[37]We have reviewed Dr. Gilman's other arguments and conclude they are without merit.

*Donald W. Gregory,* Columbus, Ohio, for Amicus Curiae American Subcontractors Association.

Before SHEARING, C. J., ROSE and MAUPIN, JJ.

## OPINION

*Per Curiam:*

This appeal concerns a dispute over a contract for structural concrete work at the Sands Exposition Center. Although subcontractor J.A. Jones Construction Company obtained a judgment for $1,152,912 against the construction management contractor, Lehrer McGovern Bovis, Inc. (LMB), Jones asserts that various district court errors resulted in an inadequate judgment.

We conclude that the district court erred in refusing to instruct the jury on exceptions to enforcement of "no damages for delay" clauses in construction contracts, and in dismissing Jones's claim of cardinal change/abandonment/quantum meruit. Additionally, although Jones was improperly required to prematurely elect between suing either on the contract or in quantum meruit, Jones's fraud-in-the-inducement claim was properly dismissed. We therefore affirm in part, reverse in part, and remand for a new trial.

### FACTS

Las Vegas Sands, Inc., awarded LMB a construction management contract for the Sands Exposition Center expansion. After substantial negotiations, LMB awarded the project's structural concrete portion to Jones. Jones's original bid for the concrete work was approximately $8.4 million. In order to reduce the bid amount, LMB agreed to perform various site preparation tasks and to streamline other tasks to shorten, by about half, the time needed for Jones to complete its concrete construction, thus reducing Jones's labor, materials, equipment and overhead costs. Both parties made concessions and ultimately agreed that Jones would perform the structural concrete work for $7.4 million.

The parties' contract provides that the first phase of Jones's work (Phase I) would begin on July 1, 1997, and had to be completed by October 7, 1997. This fourteen-weeks-long phase included the construction of three levels of reinforced concrete slabs, along with slab-supporting concrete footings, reinforced concrete columns, and some walls and stairs. According to Jones, it was able to significantly reduce its bid and to agree to specific, expedited "milestone" dates in large part because LMB promised to prepare and maintain the site in a manner that would allow Jones to efficiently perform its work in a continuous sequence. For instance, Jones was to pour the concrete footings directly against bearable caliche (subsurface rock) "neat cut" by LMB's excavator, work on a relatively level subgrade provided by LMB's excavator, use a rolling formwork system for many of the concrete pours, and be able to sequence work around the various emergency egresses that would necessarily run through parts of the construction site so that the adjoining exposition center could remain open for business throughout the project's duration. Due to various complications, some of which are discussed below, Jones did not complete Phase I until June 1998, eight months after the original completion date.

Pursuant to various requests for change orders, LMB paid Jones an additional $1,078,303 for some of the changed-work expenses incurred during those eight months; however, outstanding requests remained. After negotiations proved unsuccessful, Jones ultimately filed a complaint against LMB and National Fire Insurance Company of Hartford, holder of a surety bond related to the project. In its amended complaint, Jones alleged claims for breach of contract, fraud in the inducement, cardinal change/abandonment/quantum meruit, and for enforcement of a mechanic's lien bond. On each of its first three claims, Jones sought more than $5 million in damages.

At trial, Jones introduced evidence that some of its Phase I work was changed or modified as a result of several instructions from LMB. Its major complaint, however, stems from the obstructions, hindrances, and inefficiencies that rendered its work more difficult and costly as a result of these changes and other major problems, as well as more minor inconveniences. According to Jones, significant obstacles were encountered from the very start; various witnesses testified about the following major occurrences.

When Jones arrived on site on July 1, 1997, none of the preliminary groundwork, including caliche and footing excavations, had been completed. Because the excavation work was still in progress, Jones's crews were unable to do much work during the first two weeks of their contract. On July 3, Jones was told for the first time

that major underground utilities were being planned throughout the Phase I area, including a wide chiller line, and that a vertical permit had not yet been obtained. At about the same time, Jones also learned of a change to the emergency egress plans. The new egress plans rendered at least a portion of the unexcavated area in Phase I inaccessible to any work by Jones or the excavator for a period of time.

Eventually, the excavator mass-excavated a portion of the area, dug about seventeen footings, and then left the site without doing any further work in this area or another important area. But, in digging the chiller line trench, the excavator had blasted the caliche, which then required Jones to "form" the footings, rather than pouring the concrete directly against the caliche as intended. Additionally, after the footings were formed in the excavated area, Jones had to wait to pour the corresponding columns because LMB had not obtained a vertical permit. Jones then worked overtime to timely pour all of those columns on the same day that the permit was obtained. Nevertheless, because Jones had access only to the small excavated area in Phase I, it had to lay off crews and allow equipment to become idle during July and August. And, although the chiller line trench was covered up within a week or so, and for the most part did not itself interfere with Jones pouring the columns and elevated slabs, the pipes and electrical conduit sticking up from it did get in Jones's way. Further, once the elevated slabs in this area were finished, the chiller line trench was reopened, interfering with the removal and storing of the formwork from that area.

The excavator then excavated another Phase I area, also by blasting the caliche and again destroying its bearing capacity where the footings were to be cut. As a result, the footings in this area had to be redesigned to nearly twice their planned size. Because of the footings' increased size, Jones could not maneuver trucks in this area. Consequently, instead of pouring the concrete directly from the concrete trucks, Jones was forced to more expensively pump in the increased amount of concrete.

After the footings were in, the excavator left piles of dirt spoils from the excavation of the footings and some mechanical pad work lying around for various lengths of time, which interfered with Jones's movements. Furthermore, some of the footings were not topped-off, which left gaps in the surface eight inches to a foot below the existing ground level. At the end of September, a water main break flooded the entire site. Nevertheless, Jones continued to work at an accelerated pace throughout much of September and October to complete work on this second Phase I area, which was not finished by the milestone date.

Jones's work in attempting to meet other milestone dates was complicated by similar events. Underground sewer lines, in addition to the chiller line trench, obstructed Jones's movement of materials and equipment and prevented the placement of the slab on grade before the elevated slabs were built. Additional dirt piles left by the excavator in various places further obstructed Jones's work and movement. Having to work around these "rough" ground conditions rendered Jones's work more difficult than anticipated.

Because of the difficulties outlined above, Jones was unable to use the efficient rolling formwork system as it had planned. Nor was it able to keep together and move units of formwork using a forklift or crane because of the general ground conditions, including the still rough grade, the utility trenches, and the dirt piles. Further, Jones claimed that in light of the piecemeal manner in which the site was provided, and because the revised egress areas had to be kept open, it had nowhere to move or store units of formwork, and no opportunity to use it in a continuous manner as planned.

As a result, for each of the project's pours, Jones had to handset, move, and store the formwork piece by piece, which was inefficient and caused much damage to the plywood and lumber. In light of variations in elevation, the height of the formwork structure could not be preset, but rather Jones had to make time-consuming major adjustments to the thousands of shoring posts. But it was not only the ground conditions that prevented Jones from using a more efficient formwork method; many times Jones had to tear down shoring just to be able to store it.

The contract between Jones and LMB contains, among other items, provisions relating to the use of a rolling framework system, changes ordered, scheduling, coordination, and the importance of timelines. It also contains a "no damages for delay" clause, which provides, with emphasis added, as follows:

> Should Contractor [Jones] be obstructed or delayed in the commencement, prosecution or completion of the Work, without fault on its part, by reason of: failure to act, direction, order, neglect, delay or default of the Owner, the Architect/Engineer, Construction Manager, or any Other Contractor employed upon the Project; by changes in the Work; fire, lightning, earthquake, enemy action, act of God or similar catastrophe; by Government restrictions in respect to materials or labor; or by an industry-wide strike beyond Contractor's reasonable control, then Contractor shall be entitled to an extension of time to perform the Work which shall be equal to the time lost by reason of any or all of the causes aforesaid . . . . *Contractor expressly agrees not to make,*

*and hereby waives, any claim for damages,* including those resulting from increased labor or material costs, on account of any delay, obstruction or hindrance for any cause whatsoever, whether or not foreseeable and whether or not anticipated including but not limited to the aforedescribed causes, and *agrees that the sole right and remedy therefor shall be an extension of time,* provided the requisite condition as to written claim has been met.

Before trial, Jones proposed the following jury instruction:

Exceptions to ''No Damage For Delay Provisions''

[LMB] has raised the defense of so-called ''no damage for delay'' provisions in the subcontract. Such clauses are not enforceable if any one of several legal exceptions applies. You are to disregard this defense if you find that any one of the following legal exceptions have [sic] been proven by Jones:

1. willful concealment of foreseeable circumstances which impact timely performance[;]

2. delays not contemplated by the parties at the time they entered into the contract;

3. delays so unreasonable in length as to amount to an abandonment of the project;

4. delays caused by bad faith or fraud of the other party; and

5. delays caused by active interference on the part of the other party.

The district court, noting that Nevada has not adopted these exceptions, declined to give the proposed jury instruction. Additionally, during trial, the district court ordered Jones to elect between its contract-based and quantum meruit remedies and ultimately dismissed Jones's fraud-in-the-inducement claim. The district court also dismissed Jones's cardinal-change/abandonment/quantum meruit claim during trial.

At the trial's conclusion, the jury awarded Jones $1,152,912, using a general verdict form. As Jones points out, this amount appears related to its additional work and unpaid contract balance claims and appears not to include hindrance or inefficiency damages.

## DISCUSSION

*Instruction on exceptions to no-damages-for-delay provision*

A party has the right to have the jury instructed on all theories of the party's case that are supported by the evidence if the instruc-

tions are correct statements of the law.[1] But under NRCP 61, "[n]o error . . . is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice."

As an initial matter, LMB argues that Jones failed to properly preserve this issue for appeal because Jones did not explicitly object when the district court refused the instruction. NRCP 51 provides, "No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." Here, Jones offered the instruction, and the district court refused to give it, but Jones did not expressly object to the ruling or state the grounds for an objection. A formal objection, however, is not always necessary to preserve a jury instruction issue for appeal.[2] In this instance, the district court was on notice that Jones disagreed with its refusal to give the instruction. Jones offered substantial argument in favor of the instruction before the district court's ruling. Accordingly, Jones adequately preserved the issue for appeal despite its noncompliance with a strict interpretation of NRCP 51. We now turn to the merits of Jones's argument.

Preliminarily, we note that the contract's "no damages for delay" provision is valid and enforceable.[3] Nevertheless, we agree with Jones that the district court should have given an instruction regarding the exceptions to this provision, with certain modifications discussed below.

---

[1] *Johnson v. Egtedar,* 112 Nev. 428, 432, 915 P.2d 271, 273 (1996); *see Beattie v. Thomas,* 99 Nev. 579, 583, 668 P.2d 268, 271 (1983).

[2] *E.g., Duran v. Mueller,* 79 Nev. 453, 458, 386 P.2d 733, 736 (1963) ("[I]t is preferable that each instruction be discussed separately and counsel's position made clear."); *Otterbeck v. Lamb,* 85 Nev. 456, 460, 456 P.2d 855, 858 (1969); *Tidwell v. Clarke,* 84 Nev. 655, 661, 447 P.2d 493, 496 (1968) ("Where counsel clearly, fairly and timely calls to the attention of the trial court the issue of law involved, any slight omission in compliance with our interpretation of Rule 51 will not preclude him from raising the issue on appeal." (citing *Green v. Reading Co.,* 183 F.2d 716, 719 (3d Cir. 1950); *Williams v. Powers,* 135 F.2d 153, 156 (6th Cir. 1943); *Pierro v. Carnegie-Illinois Steel Corp.,* 186 F.2d 75, 78 (3d Cir. 1950))); *see also Johnson v. Egtedar,* 112 Nev. 428, 915 P.2d 271 (1996).

[3] *See generally* Maurice T. Brunner, Annotation, *Validity and Construction of "No Damage" Clause with Respect to Delay in Building or Construction Contract,* 74 A.L.R.3d 187, § 2[a] (1976).

First, most of the exceptions in Jones's proposed instruction will aid in enforcing the ''implied covenant of good faith and fair dealing [that] exists in every Nevada contract and essentially forbids arbitrary, unfair acts by one party that disadvantage the other.''[4] Four of the five proposed exceptions relate directly to and are logical extensions of the implied covenant of good faith and fair dealing: (1) willful concealment of foreseeable circumstances that impact timely performance, (2) delays so unreasonable in length as to amount to project abandonment, (3) delays caused by the other party's bad faith or fraud, and (4) delays caused by the other party's active interference. As the South Carolina Supreme Court recognized in *United States v. Metric Constructors, Inc.,*[5] these exceptions give rise to a violation of the duty of good faith and fair dealing and are therefore a logical extension of existing law. Additionally, they have been adopted by a majority of jurisdictions.[6] We therefore conclude that an instruction including these four exceptions should have been given, with one modification. The exception for ''willful concealment of foreseeable circumstances that impact timely performance,'' which apparently was included to encompass Jones's specific factual allegation in the instant case, should be blended with the exception for ''delays caused by the other party's bad faith or fraud'' to create a more general exception: delays caused by fraud, misrepresentation, concealment or other bad faith.

LMB argues that the proposed instruction would have been cumulative, since the parties agreed to the following instruction on the implied duty of good faith and fair dealing:

> Every contract imposes upon each party an implied duty of good faith and fair dealing in its performance and its enforcement. However, this implied duty of good faith and fair dealing, standing alone, cannot overrule or modify the express terms of a contract.

Although the parties agreed to this instruction, it was facially defective and therefore constitutes plain error.[7] The instruction stated that the implied covenant of good faith and fair dealing cannot modify a contract's express terms, but we have held that when ''the terms of a contract are literally complied with but one party to the contract deliberately contravenes the intention and spirit of

---

[4]*Frantz v. Johnson,* 116 Nev. 455, 465 n.4, 999 P.2d 351, 358 n.4 (2000).

[5]480 S.E.2d 447 (S.C. 1997).

[6]*See generally* Brunner, *supra* note 3, § 2[a].

[7]*See Bradley v. Romeo,* 102 Nev. 103, 105, 716 P.2d 227, 228 (1986) (noting that this court can consider relevant issues *sua sponte* to prevent plain error).

the contract, that party can incur liability for breach of the implied covenant of good faith and fair dealing."[8]

And, even if the instruction had been accurate, we concluded in *American Casualty Co. v. Propane Sales & Service,*[9] that "general, abstract ('stock') statements of the law are not sufficient if [a] proper request for a specific instruction on some important point has been duly proffered to the court." Here, Jones properly requested a specific instruction concerning the enforceability of a "no damages for delay" clause in a construction contract. Consequently, a stock "duty of good faith" instruction was not sufficient.

Jones's final proposed exception, for "delays not contemplated by the parties at the time they entered into the contract," has been adopted by some courts and soundly rejected by others. In *Corinno Civetta Construction v. City of New York,*[10] the court adopted this exception on the basis that "[i]t can hardly be presumed . . . that the contractor bargained away his right to bring a claim for damages resulting from delays which the parties did not contemplate at the time." Courts that have rejected this exception point out that some delays cannot be contemplated and that the provision is meant to encompass these unforeseen delays. In *Gregory & Son, Inc. v. Guenther & Sons,*[11] the Wisconsin Supreme Court aptly noted these concerns:

> Indeed, the adoption of a "no damage for delay" clause shows that the parties realize that some delays cannot be contemplated at the time of the drafting of the contract. . . . The parties can deal with delays they contemplate by adjusting the start and completion dates or by including particular provisions in the contract. "[I]t is the unforeseen events which

[8]*Hilton Hotels v. Butch Lewis Productions,* 107 Nev. 226, 232, 808 P.2d 919, 922-23 (1991).

[9]89 Nev. 398, 400, 513 P.2d 1226, 1227 (1973); *cf. Village Development Co. v. Filice,* 90 Nev. 305, 314, 526 P.2d 83, 88 (1974) (noting that " '[i]f one instruction adequately covers a given theory of liability or defense, it is preferable that the court refuse additional instructions relating to the same theory, though couched in different language' " (quoting *Duran v. Mueller,* 79 Nev. 453, 460, 386 P.2d 733, 373 (1963))).

[10]493 N.E.2d 905, 910 (N.Y. 1986).

[11]432 N.W.2d 584, 587 (Wis. 1988) (quoting *City of Houston v. R. F. Ball Const. Co.,* 570 S.W.2d 75, 78 (Tex. Civ. App. 1978)); *accord U.S. v. Metric Constructors, Inc.,* 480 S.E.2d 447, 450 (S.C. 1997); *State Highway Admin. v. Greiner,* 577 A.2d 363, 372 (Md. Ct. Spec. App. 1990).

occasion the broad language of the clause since foreseeable ones could be readily provided for by specific language.''

We are persuaded that rejecting this exception is the better reasoned approach. As recognized in *Gregory,* ''[k]nowing that unforeseen delays . . . can occur, parties can bargain accordingly. A subcontractor can protect itself from the risk of unforeseen delay simply by adjusting its bid price in recognition of the potential additional costs or by refusing to accept such a provision in the contract.''[12]

In sum, the district court's instruction should have included the following three exceptions:

> (1) delays so unreasonable in length as to amount to project abandonment;
> (2) delays cased by the other party's fraud, misrepresentation, concealment or other bad faith; and
> (3) delays caused by the other party's active interference.

## *Election of claims/remedies*

On the seventh day of the trial, the district court directed Jones to choose between suing on the contract and in quantum meruit. So required, Jones elected to sue on the contract. Despite having requested quantum meruit relief in its fraud-in-the-inducement and cardinal-change/contract-abandonment causes of action, however, Jones maintained that the elements of those theories were also relevant to its breach-of-contract claim. The district court did not expressly dismiss either the fraud claim or the cardinal-change/abandonment claim at this point, but rather reconsidered the issues later in the trial.

Nonetheless, Jones should not have been forced to choose between the two types of claims. Although a party may not assert contradictory theories of recovery such that the assertion of one theory will necessarily repudiate the other, the doctrine of election of remedies applies '' 'only to *inconsistent* remedies.' ''[13] Such contradiction or inconsistency is not found here.

As the Ninth Circuit Court of Appeals has recognized, causes of action for fraud in the inducement and breach of contract may be pursued as distinct claims with separate and consistent remedies:

---

[12]432 N.W.2d at 587.

[13]*Barringer v. Ray,* 72 Nev. 172, 178, 298 P.2d 933, 936 (1956) (quoting *Sackett v. Farmers' State Bank,* 228 N.W. 51, 52 (Iowa 1929)).

It is the law that one who has been fraudulently induced into a contract may elect to stand by that contract and sue for damages for the fraud. When this happens and the defrauding party also refuses to perform the contract as it stands, he commits a second wrong, and a separate and distinct cause of action arises for the breach of contract. . . . The courts of many states have recognized the rule that a suit on a contract and a suit for fraud in inducing the contract are two different causes of action with separate and consistent remedies.[14]

Likewise, in *Paterson v. Condos*,[15] we specifically concluded that an action may be based upon quantum meruit even though an express contract exists: "The contractor may . . . base his action upon both the contract and upon a quantum meruit by setting up the former in one count, and the latter in another in his complaint." That a contract may have been changed or abandoned does not negate the assertion that at some point there existed a breachable contract. Therefore, Jones is not required to elect between suing on the contract or in quantum meruit before obtaining a jury verdict.[16] As we noted in *Topaz Mutual Co. v. Marsh*,[17] however, the district court can determine, after trial, if a duplicate recovery has been obtained on the two theories of recovery:

A plaintiff may assert several claims for relief and be awarded damages on different theories. It is not uncommon to see a plaintiff assert a contractual claim and also a cause of action asserting fraud based on the facts surrounding the contract's execution and performance. The measure of damages on claims of fraud and contract are often the same. However, [a plaintiff] is not permitted to recover more than her total loss plus any punitive damages assessed.

It appears that some confusion existed as to whether Jones's election to sue on the contract necessarily abrogated its fraud-in-the-inducement and cardinal-change/contract-abandonment claims

---

[14]*Bankers Trust Co. v. Pacific Employers Insurance Co.*, 282 F.2d 106, 110 (9th Cir. 1960) (citing as examples: *Bohn v. Watson*, 278 P.2d 454, 461 (Cal. Ct. App. 1954); *Union Cent. Life Ins. Co. v. Scheidler*, 29 N.E. 1071, 1072 (Ind. 1892)).

[15]55 Nev. 134, 142, 28 P.2d 499, 500 (1934).

[16]*See also May v. Watt*, 822 F.2d 896 (9th Cir. 1987) (determining that a party is not required to make an election between breach of contract remedies and rescission prior to a jury verdict); *North American Graphite Corp. v. Allan*, 184 F.2d 387 (D.C. Cir. 1950) (concluding that no election between theories of recovery based on breach of contract and quantum meruit is required prior to a jury verdict).

[17]108 Nev. 845, 851-52, 839 P.2d 606, 610 (1992) (citation omitted).

at that time. Jones, however, has not demonstrated that its premature election resulted in its being prejudiced before the claims were formally dismissed. Indeed, Jones argues that it submitted sufficient evidence of each claim at trial. Consequently, we will now consider the district court's formal dismissal of these claims.[18]

*Fraud in the inducement*

Jones's claim for fraud in the inducement was formally dismissed on the thirteenth day of trial when the district court granted LMB's NRCP 41(b) motion. NRCP 41(b) provides for the involuntary dismissal of a claim after the close of the plaintiff's case "on the ground that upon the facts and the law the plaintiff has failed to prove a sufficient case for the court or jury." The district court, in ruling on a 41(b) motion, "must accept the plaintiff's evidence as true, draw all permissible inferences in the plaintiff's favor, and not assess the credibility of the witnesses or the weight of the evidence."[19] When reviewing dismissals with prejudice under NRCP 41(b), we apply a "heightened" standard of review: " '[a] claim should not be dismissed . . . unless it appears to a certainty that the plaintiff is not entitled to relief under any set of facts which could be proved in support of the claim.' "[20]

The district court found that Jones did not introduce evidence rising to the standard required to prove that LMB acted fraudulently in this case. We agree.

To establish fraud in the inducement, Jones must prove by clear and convincing evidence each of the following elements: (1) a false representation made by LMB, (2) LMB's knowledge or belief that the representation was false (or knowledge that it had an insufficient basis for making the representation), (3) LMB's intention to therewith induce Jones to consent to the contract's formation,[21] (4) Jones's justifiable reliance upon the misrepresentation, and (5) damage to Jones resulting from such reliance.[22] We have recog-

---

[18]*See* NRCP 61; *El Cortez Hotel, Inc. v. Coburn,* 87 Nev. 209, 484 P.2d 1089 (1971).

[19]*Chowdhry v. NLVH, Inc.,* 109 Nev. 478, 482, 851 P.2d 459, 461 (1993).

[20]*Pierce Lathing Co. v. ISEC, Inc.,* 114 Nev. 291, 297, 956 P.2d 93, 96 (1998) (quoting *Pemberton v. Farmers Ins. Exchange,* 109 Nev. 789, 792, 858 P.2d 380, 381 (1993)).

[21]*See Rosenthal v. Great Western Financial Sec.,* 926 P.2d 1061, 1073 (Cal. 1996) (differentiating fraud in the inducement from other types of fraud).

[22]*Wohlers v. Bartgis,* 114 Nev. 1249, 1260-61, 969 P.2d 949, 958 (1998).

nized that "[f]raud is never presumed; it must be clearly and satisfactorily proved."[23]

Jones primarily bases its fraud-in-the-inducement claim on the following: (1) preparation for underground utilities began shortly after the contract was signed, despite LMB's assurances that no underground utilities would be installed; (2) LMB knew that some areas of caliche had required blasting, but nevertheless promised Jones that its footings could be poured directly against bearable caliche; and (3) LMB knew that some kind of revision to an egress would be necessary. According to Jones, these facts show that LMB's representations at the time of contract negotiations and signing must have been false and that LMB intended to deceitfully induce Jones into signing a contract that LMB knew could not have been carried out as planned. No evidence introduced at trial, however, clearly and convincingly demonstrates that LMB intended to deceive Jones into signing the contract based on information it knew at the time was either false or lacked a sufficient basis as related to Jones's specific work plans in the Phase I area. Accordingly, we conclude that Jones presented insufficient evidence to present this cause of action to the jury, and we affirm the district court's dismissal of Jones's fraud-in-the-inducement claim.

## Cardinal change/abandonment/quantum meruit

Jones asserts that the district court erred by dismissing its "cardinal change/abandonment/quantum meruit" claim on day twelve of the trial. In dismissing the claim for quantum meruit, the district court recognized that Jones had relinquished this claim, and apparently the corresponding contract-abandonment cause of action, when it elected to sue on the contract. As explained above, the district court erred when it forced Jones to choose to either sue on the contract or for quantum meruit.[24]

The district court further declined to adopt the cardinal-change doctrine for Nevada courts, and determined that even if the doctrine were available, it would not apply. Jones presented its cardinal-change and abandonment theories as one claim, arguing that contract abandonment and cardinal change were essentially the same and could lead to recovery in quantum meruit. As discussed below, we conclude that Jones has introduced evidence sufficient to submit both theories to the jury.[25]

---

[23]*Havas v. Alger,* 85 Nev. 627, 631, 461 P.2d 857, 860 (1969).

[24]*See Paterson,* 55 Nev. at 142, 28 P.2d at 500.

[25]Additionally, although Jones has not asserted on appeal that a separate claim for quantum meruit would be appropriate, we note that both the contract-abandonment and cardinal-change theories may result in a damages award based on quantum meruit.

### Contract abandonment

Different theories exist by which contractors have recovered the reasonable value of performed work not contemplated by the terms of a contract. The contract-abandonment theory has been used in some cases to permit recovery outside the contract when the work contracted for is altered beyond the contract's scope.[26] In fact, in the 1930s, we recognized a claim for quantum meruit based upon the abandonment of a contract:

> "It is the common experience of men that changes and alterations in the original plans and specifications of buildings are the rule, and not the exception, and the legal rule seems to be well established, as stated by counsel for plaintiff in error, 'that where additions are ordered to be made, and are made, to a building which a workman has contracted to furnish for a certain sum, the original contract is held to exist as far as it can be traced to have been followed, and the excess must be paid for according to its reasonable value;' and it is only where the alterations and changes are so great that it is impossible to follow the original contract that it will be deemed to have been wholly abandoned, so that the contractor can recover upon a quantum meruit."[27]

Generally, contract abandonment occurs when both parties depart from the terms of the contract by mutual consent. This consent may be express, or it may be implied by the parties' actions, such as when " 'the acts of one party inconsistent with [the contract's] existence are acquiesced in by the other.' "[28] Contract abandonment has been recognized "where there have been so many substantial changes to the special contract that it can no longer be used to determine the value of the work done."[29] The issue of whether contract abandonment has occurred generally presents a question of fact.[30]

---

[26]*See, e.g., C. Norman Peterson Co. v. Container Corp.,* 218 Cal. Rptr. 592, 598 (Ct. App. 1985).

[27]*Paterson,* 55 Nev. at 141, 28 P.2d at 500 (quoting *Hood v. Smiley,* 36 P. 856, 857 (Wyo. 1894)).

[28]*See id.* at 141-42, 28 P.2d at 500 (quoting 13 C.J. 601); *C. Norman Peterson,* 218 Cal. Rptr. at 600.

[29]*Rudd v. Anderson,* 285 N.E.2d 836, 840 (Ind. Ct. App. 1972); *see also Modern Builders, Inc. of Tacoma v. Manke,* 615 P.2d 1332, 1337 (Wash. Ct. App. 1980) ("[P]arties to a contract may possibly agree to changes from the original agreement which are so extensive that the contract must be deemed abandoned as a matter of law."), *cited in Rowland v. Lepire,* 99 Nev. 308, 662 P.2d 1332 (1983).

[30]*See, e.g., Harris v. IES Associates, Inc.,* 69 P.3d 297, 305 (Utah Ct. App. 2003).

At trial, Jones introduced evidence from which a jury could conclude that by directing Jones to perform its work at an inadequately prepared and maintained site, LMB in effect directed Jones to perform work inconsistent with provisions in the parties' contract which specifically described the efficient manner and time frame in which Jones was to perform its work. Jones testified that it nevertheless agreed to perform the changed work, despite incurring significant increases in cost and time, on the belief that it would be paid by LMB on terms other than those identified in the contract.

Although Jones attempted to recover all of its claimed additional costs under the terms of the contract, Jones from the start asserted that the contract schedule and costs no longer pertained to its work. At that time, LMB directed Jones to continue to work, even though no price for the changed work had been set. Jones asserts that it only attempted to put its "impact costs" into contractual terms after LMB later instructed Jones to do so. Although the contract's change order provision did not require new prices to be agreed upon before commencing changed work, it is possible that a jury could conclude, based on the facts of this case, that both parties impliedly agreed to abandon the terms of the contract. Thus, Jones introduced sufficient evidence to present its theory of contract abandonment to the jury, and therefore, the district court improperly dismissed the contract-abandonment claim.

### Cardinal change

The cardinal-change doctrine serves " 'to provide a breach remedy for contractors who are directed . . . to perform work which is not within the general scope of the contract,' " and which is therefore not redressable under the contract.[31] Thus, a cardinal change occurs when the work is so drastically altered that the contractor effectively performs duties that are materially different from those for which the contractor originally bargained.[32] "[T]he contractor must prove facts with specificity that support its allegations that a cardinal change occurred."[33] Although the cardinal-change doctrine was created as a check on the government's ability to circumvent the competitive-bidding process by ordering drastic changes beyond those contemplated in the contract,[34] and

---

[31]*PCL Const. Services, Inc. v. U.S.*, 47 Fed. Cl. 745, 804 (2000) (citations omitted); *see Atlantic Dry Dock Corp. v. U.S.*, 773 F. Supp. 335, 339 (M.D. Fla. 1991).

[32]*Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1332 (Fed. Cir. 2003).

[33]*PCL*, 47 Fed. Cl. at 804.

[34]*Miller Elevator Co. v. U.S.*, 30 Fed. Cl. 662, 677 (1994) (" 'The basic standard is whether the modified contract calls for essentially the same per-

has been predominantly discussed in disputes based on government contracts, its underlying premise—that compensation for costs resulting from an abuse of authority under the changes clause should not be limited by the terms of that clause—applies to private contracts that include changes clauses.[35] Consequently, we conclude that this cause of action is viable in the context of private construction contracts.

The court in *Becho, Inc. v. United States*[36] presents a summary of the cardinal-change analysis:

> Whether a change is cardinal is principally a question of fact, requiring that each case be analyzed individually in light of the totality of the circumstances. ''Each case must be analyzed on its own facts and in light of its own circumstances, giving just consideration to the magnitude and quality of the changes ordered and their cumulative effect upon the project as a whole.'' Further, ''[a] determination of the scope and nature of alleged changes requires a fact-intensive inquiry into the events that led to the excess work and their effect on the parties. The court must investigate the contract as a whole to determine whether [the owner or construction manager] is responsible for the contractor's difficulties. . . .''[37]
>
> . . . Indeed, while there is no precise calculus for determining whether a cardinal change has occurred, the courts have considered, *inter alia*, the following factors: (i) whether there is a significant change in the magnitude of work to be

formance as that required by the contract when originally awarded so that the modification does not materially change the field of competition.' '' (quoting *Cray Research, Inc. v. Department of Navy*, 556 F. Supp. 201, 203 (D.C. 1982))).

[35]*See, e.g., Hensel Phelps Const. v. King County*, 787 P.2d 58 (Wash. Ct. App. 1990) (concluding that a subcontractor whose contract incorporated terms of a government contract had not demonstrated the occurrence of a cardinal change when the shape and size of an area to be painted remained the same and its only claims were for acceleration, having to re-do work, and problems involving the stacking of trades); *L.K. Comstock & Co. v. Becon Cost. Co.*, 932 F. Supp. 906, 938-39 (E.D. Ky. 1993) (discussing ''[o]ther cases in which state courts have applied the cardinal change doctrine''); *Westinghouse Elec. Corp. v. Garrett Corp.*, 437 F. Supp. 1301 (D. Md. 1977) (finding, under Maryland law and strongly persuasive government contract law, that the failure to provide certain plans according to various assurances made pursuant to a time-sensitive contract was a fundamental breach in the first instance, but which could also be held a breach due to cardinal change).

[36]47 Fed. Cl. 595 (2000); *see also Rumsfeld*, 329 F.3d at 1332.

[37]*See Stone Forest Industries, Inc. v. U.S.*, 973 F.2d 1548, 1550-51 (Fed. Cir. 1992) (determining that a material breach of contract ''depends on the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties'').

performed; (ii) whether the change is designed to procure a totally different item or drastically alter the quality, character, nature or type of work contemplated by the original contract; and (iii) whether the cost of the work ordered greatly exceeds the original contract cost.[38]

Although LMB relies on *PCL Construction Services, Inc. v. United States*[39] for the proposition that courts will refuse to find that a cardinal change took place when the structure built is essentially the same structure contracted for, we agree with the conclusion reached by other courts, that "[a] cardinal change can occur even when there is no change in the final product because 'it is the entire undertaking of the contractor, rather than the product, to which we look.'"[40]

In this case, as LMB points out, the overall physical characteristics of Jones's work changed very little. The real question, however, is whether the entirety of the changes and impacts on Jones's work was so extensive as to force Jones to perform work beyond the confines of the contract. As set forth above, Jones presented testimony demonstrating material impacts on its contractual scope of work. And, Jones asserts that out of its $7.4 million bid, it expected to capture $1.9 million in overhead and profit, leaving $5.5 million in anticipated costs. The actual costs, according to Jones, totaled over $8.8 million. Additionally, Jones's expert testified that about $4 million, or 62 percent of the Phase I work value, was incurred because of changes. The evidence required to demonstrate the occurrence of cardinal change is similar to that required by the contract-abandonment theory and, under these circumstances, it appears to us that Jones could also be entitled to relief on its claim under a theory of cardinal change.[41] Consequently, the district court erred in dismissing this claim.

[38]*Becho, Inc.,* 47 Fed. Cl. at 601 (citations omitted) (concluding, in light of the factual nature of the inquiry, that a motion for summary judgment on the issue of cardinal change was precluded by existing material questions of fact).

[39]47 Fed. Cl. 745 (2000).

[40]*Rumsfeld,* 329 F.3d at 1332 (quoting *Edward R. Marden Corporation v. United States,* 442 F.2d 364, 370 (Cl. Ct. 1971)); *L.K. Comstock,* 932 F. Supp. at 940.

[41]We note that recovery of a party's total costs of performance in quantum meruit, as Jones is apparently claiming as damages in its cardinal-change claim, may not be an appropriate measure of recovery where a cardinal change has been found. *See Amelco Electric v. City of Thousand Oaks,* 38 P.3d 1120, 1126 (Cal. 2002).

## CONCLUSION

Based upon our discussion above, we affirm that portion of the district court's judgment dismissing Jones's fraud-in-the-inducement claim, we reverse the remainder of the district court's judgment, and we remand this case to the district court for a new trial consistent with this opinion.[42]

___

[42]We have carefully examined appellant's other claims, but in light of our decision today, we need not reach them.