ALIYA MEDCARE FINANCE,
LLC, Plaintiff,

v.

Robert P. NICKELL, an individual; Comprehensive Toxicology Billing, LLC, a California limited liability company; Exec Billing Services, LLC, a California limited liability company; and Does 1-10, inclusive, Defendants.

CASE NO. CV 14-07806 MMM (SHx)

United States District Court,
C.D. California.

Signed May 26, 2015

Kevin M. Yopp, Law Offices of Kevin M. Yopp, APC, Santa Monica, CA, Richard William Buckner, Glaser Weil Fink Howard Avchen and Shapiro LLP, Los Angeles, CA, for Plaintiff.

Steven M. Goldberg, Emil Petrossian, Viral Mehta, Manatt Phelps and Phillips LLP, Los Angeles, CA, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

MARGARET M. MORROW, UNITED STATES DISTRICT JUDGE

On October 8, 2014, Aliya Medcare Finance, LLC ("Aliya") filed this action against Robert P. Nickell, Comprehensive Toxicology Billing, LLC ("CTB"), Exec Billing Services, LLC ("Exec Billing") (collectively "defendants"), and various fictitious defendants.[1] The complaint alleged eleven claims arising from a dispute concerning negotiation and implementation of a factoring agreement between Aliya and defendants. On November 20, 2014, Aliya filed an *ex parte* application for a temporary restraining order.[2] It sought a temporary restraining order requiring defendants to (1) transfer to Aliya all funds received to date as payment on receivables Aliya had purchased from CTB; (2) continue to transfer to Aliya, until the conclusion of a trial on the merits, all funds received as payment on receivables Aliya had purchased from CTB; (3) give Aliya any and all documentation received concerning receivables it had purchased; (4) give Aliya access to the billing and collection software used to manage and collect the receivables it had purchased from CTB; and restraining defendants from (5) managing, controlling, collecting, or taking any action with respect to receivables Aliya had purchased from CTB except as provided in items (1)-(4) above.[3] On November 26, 2015, the court denied Aliya's application because it had not adequately shown that it would suffer imminent, irreparable harm if an injunction were not entered.[4]

On December 18, 2014, Aliya filed a first amended complaint.[5] The first amended complaint alleges eleven claims.[6] It pleads claims against Nickell and CTB for fraud in the inducement of the factoring agree-

1. Complaint, Docket No. 1 (Oct. 8, 2014).

2. *Ex Parte* Application ("Application"), Docket No. 8 (Nov. 20, 2014).

3. *Id.* at 1; [Proposed] Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction, Docket No. 8–1 (Nov. 20, 2014) at 1–2.

4. Order Denying *Ex Parte* Application for a Temporary Restraining Order, Docket No. 20 (Nov. 26, 2014).

5. First Amended Complaint ("FAC"), Docket No. 23 (Dec. 18, 2014).

6. The first amended complaint dropped a breach of the covenant of good faith and fair dealing claim and added a UCL claim against

ment; fraudulent concealment; promissory fraud; negligent misrepresentation; and conversion.[7] It also alleges separate breach of contract claims against CTB and Exec Billing;[8] intentional interference with contractual relations and violation of California Business and Professions Code § 17200 claims against Nickell; and claims for an accounting and imposition of a constructive trust against all defendants.

On December 29, 2014, the court approved the parties' stipulation to extend defendants' time to respond to the first amended complaint to January 30, 2015.[9] On January 30, 2015, defendants filed a motion to dismiss the first through fourth and sixth through tenth claims in Aliya's first amended complaint; they do not seek dismissal of Aliya's fifth claim for breach of contract against CTB or eleventh claim for an accounting.[10] Aliya opposes the motion.[11]

## I. FACTUAL BACKGROUND

Aliya is in the business of factoring.[12] The complaint alleges that Nickell is a successful pharmacist and businessman who owns and controls multiple undercapi-

talized shell entities through which he conducts a multimillion dollar medical services business.[13] One such entity is CTB, which provides toxicology services—specifically urinalysis—to patients with workers' compensation claims. As relevant here, instead of charging patients directly for toxicology services, CTB allegedly invoices an insurance company that provides coverage for the services.[14] The right to receive payments from insurance providers is purportedly a receivable that is often marketed and sold to third parties that factor receivables.[15] CTB has allegedly originated thousands of such receivables, each of which typically represents a bill of $800 to $1,400.[16]

### A. The Factoring, Non–Compete, and Indemnification Agreements

Beginning in the fourth quarter of 2012 and continuing to the first quarter of 2013, CTB and Aliya allegedly entered into three factoring agreements pursuant to which Aliya purchased existing CTB receivables and an exclusive right to acquire all right, title, and interest to CTB's future receivables for a period of five years.[17]

---

Nickell. It otherwise asserts the same claims as the original complaint.

7. The conversion claim is also alleged against the various Doe defendants.

8. The breach of contract claim against Exec is also alleged against the various Doe defendants.

9. Order Approving Stipulation to Extend Time, Docket No. 30 (Dec. 29, 2014); Stipulation to Extend Time to Respond, Docket No. 27 (Dec. 29, 2014).

10. Notice of Motion and Motion to Dismiss First Amended Complaint ("Motion"), Docket No. 44 (Jan. 30, 2015); see also Reply in Support of Motion to Dismiss ("Reply"), Docket No. 91 (Apr. 20, 2015).

11. Opposition to Motion to Dismiss First Amended Complaint ("Opposition"), Docket No. 90 (Apr. 13, 2015).

12. "Factoring is ... the sale of accounts receivable of a firm to a factor at a discounted price. In return for selling the accounts receivable at a discounted price, the seller receives two immediate advantages: (1) immediate access to cash; and (2) the factor assumes the risk of loss." *In re Straightline Investments, Inc.*, 525 F.3d 870, 883 (9th Cir.2008).

13. FAC, ¶ 4.

14. *Id.*, ¶ 5.

15. *Id.*, ¶ 6.

16. *Id.*, ¶ 25.

17. FAC, ¶ 26.

The first agreement, which was executed in November 2012, documented Aliya's purchase of $7.9 million of CTB's receivables;[18] the second agreement, which was executed in February 2013, reflected Aliya's purchase of $4.1 million of CTB's receivables,[19] while the third agreement, executed in March 2013, documented Aliya's purchase of $18 million of CTB's receivables.[20] The third agreement also gave Aliya the exclusive right to purchase all of CTB's future receivables for five years, or until January 2018.[21] Aliya asserts that by entering into these agreements, it acquired the right to receive all payments made on all of CTB's then-existing receivables as well as all future receivables through January 2018.[22]

Aliya alleges that, to induce it to enter into the third agreement and pay in excess of $4 million for the receivables being purchased, Nickell executed and delivered a covenant not to compete and a covenant to indemnify.[23] The non-competition clause purportedly required all entities affiliated with CTB (the "Nickell entities"), including Exec Billing, to acknowledge that they and their respective managers, including Nickell, would conduct all toxicology business solely through CTB—for Aliya's benefit—and ensure that they operated in such a way that all receivables generated were subject to the third agreement.[24] In the indemnification clause, the Nickell entities allegedly promised to indemnify Aliya for any loss caused by CTB's breach of the third agreement.[25]

Aliya, for its part, agreed to purchase all of CTB's receivables without conducting any due diligence; in exchange, it negotiated a provision that permitted it to return any and all receivables that failed to meet certain criteria.[26] Thus, section 14 of the third agreement provided that Aliya "shall have the right, at any time, to reject any [r]eceivable that, in [Aliya's] judgment, meet or includes one or more of the following criteria...."[27] The criteria set forth in section 14, for example, permitted Aliya to reject receivables that represented claims or charges "requested by a physician of record that [are] not within the applicable 'Medical Provider Network' [ ("MPN") ]," i.e., claims presented by out-of-network providers.[28] Section 14 also provided that if Aliya rejected a receivable based on any of the enumerated criteria, CTB would "have the opportunity to object to [Aliya's] classification of [the] [r]eceivable as [rejectable] within 10 days of receiving notice thereof[;] ... the parties [ ] agree[d] to make a 'good faith effort to mutually determine whether the cause of such [r]eceivable becoming [rejectable] [could] be cured by [CTB] within a commercially reasonable time." "With respect to any [r]ejected [r]eceivable that [as to which CTB could not cure], an amount equal to the applicable [p]urchase [p]rice ... [was to] be deducted from the immedi-

---

18. *Id.,* ¶ 27. See also *id.* Exh. A ("First Agreement").

19. *Id.,* ¶ 28. See also *id.* Exh. B ("Second Agreement").

20. *Id.,* ¶ 29. See also *id.* Exh. C ("Third Agreement").

21. *Id.,* ¶ 29.

22. *Id.,* ¶ 32.

23. *Id.,* ¶ 30. See also *id.* Exh. C ("Non–Compete"), Exh. D ("Indemnification Agreement").

24. *Id.,* ¶ 31.

25. *Id.*

26. *Id.,* ¶ 39.

27. *Id.* (emphasis removed). See also Third Agreement, § 14.

28. Third Agreement, § 14(f).

ately following [m]onthly [f]unding [a]mount, or, in the event that no [t]ransaction [m]onth remain[ed] ... [CTB] [was obligated to] pay the applicable [p]urchase [p]rice for such [r]eceivable to [Aliya] within five [ ] business days." [29] Rejected receivables were deemed to belong to CTB; as a result, the agreement provided that CTB could "collect on or sell" any rejected receivable.[30]

Aliya alleges that it purchased an additional $52.6 million of future receivables from CTB under the third agreement. In total, it contends it has purchased "all of CTB's receivables, which amounts to over $83 million of receivables." [31]

## B. Alleged Misrepresentations Concerning In–Network Doctors

The third agreement allegedly required that all receivables represent charges by referring physicians who were "in-network." [32] At the time it entered into the third agreement, Aliya became increasingly concerned that providers be in-network because California Senate Bill 863 had taken effect in January 2013, and Aliya believed insurance companies would begin to scrutinize whether a provider was in-network more closely, which in turn would materially affect the collectability of receivables representing charges submitted by out-of-network providers.[33] To assuage these concerns, Nickell purportedly repre-

sented in telephone conversations and meetings at his office that the doctors ordering toxicology services from CTB were in-network.[34] This representation allegedly proved false. Aliya asserts that it initially did not know the number of receivables being denied by insurance companies because the referring physician was out-of-network. CTB purportedly handled collection and servicing of accounts, pursuant to an agreement between the parties, until June 2013. At that time, Aliya formed its own in-house collections department.[35] Soon after it began handling collections in house, Aliya allegedly "noticed that insurance companies had denied payment of a large number of receivables because the referring physician was out-of-network." [36] It contends it did not know this earlier because CTB did not provide any documentation from insurance companies; it purportedly communicated only the amount paid by insurers and remitted that amount to Aliya.[37] By September 2013, insurers' denial of claims submitted by out-of-network physicians allegedly totaled millions of dollars.[38] When Aliya confronted Nickell, he purportedly denied that any doctors were out-of-network; he asserted that insurers offer any reason, including a blatantly false one, to avoid payment.[39]

29. Third Agreement, § 14.

30. *Id.*

31. FAC, ¶¶ 33–34.

32. *Id.*, ¶ 35.

33. *Id.*, ¶ 37. S.B. 863 provided, *inter alia,* "that a treating physician be included in the network only if the physician or authorized employee of the physician gives a separate written acknowledgment that the physician is a member of the network, and would require every medical provider network to include one or more persons employed as medical access assistants to help an injured employee

find an available physician and assist employees in scheduling appointments." See 2012 Cal. Legis. Serv. Ch. 363 (S.B.863).

34. *Id.*, ¶ 38.

35. *Id.*, ¶¶ 42–43.

36. *Id.*, ¶ 44.

37. *Id.*, ¶ 45.

38. *Id.*, ¶ 46.

39. *Id.*

Once it learned of the out-of-network problem, Aliya purportedly formed a team of dedicated staff to research whether the physicians referring toxicology business to CTB were actually within the applicable MPN, as Nickell had purportedly represented and confirmed.[40] Its investigation focused on the network status of 26 physicians that "collectively referred the vast majority of CTB's business," and 44 insurance companies that were "the most common payors with respect to the receivables."[41] It learned that only four of the 26 physicians had in-network status with at least one of the 44 payors; none had in-network status with more than two of the 44 insurance companies.[42]

Aliya presented the results of its research to Nickell at a meeting on October 8, 2013. After reviewing it, Nickell purportedly said that Aliya's staff was incompetent and maintained that all physicians referring business to CTB were in-network providers of virtually every relevant insurance company.[43] Nickell allegedly claimed he would contact one of the twenty-six physicians and obtain documentation proving that he was within "all MPNs," but never did so.[44] In fact, Aliya asserts that Nickell and CTB finally admitted that the "vast majority" of the referring doctors were not within the applicable MPN.[45] At that point, the parties sought to negotiate a mutually agreeable solution.[46]

### C. Aliya's Rejection of Certain Receivables and CTB's Alleged Failure to Provide Reasonable Assurances Concerning Repayment

When no resolution was reached, on October 19, 2014, Aliya formally rejected $17,650,096.36 of receivables; it asserted that the receivables were properly rejected under section 14(f) of the third agreement because the referring physicians were out-of-network.[47] It requested a refund of $3,654,224.50, the purchase price it paid for the receivables.[48] Simultaneously, it asked that CTB provide reasonable assurances that it would pay the refund; this was done, Aliya asserts, because it believed CTB could not pay Aliya "any significant amounts based on statements made by Nickell."[49] In particular, Nickell allegedly stated that CTB had no remaining assets, because its only assets were the receivables it had sold to Aliya, and that he would be willing to transfer ownership of CTB to Aliya for nominal consideration of $1.[50] On the basis of this statement, Aliya contends it reasonably assumed that the millions of dollars it paid CTB for receivables had already been distributed to Nickell or otherwise dissipated.[51] It concluded that CTB was a special purpose entity created solely to originate and hold receivables, with no other assets or liabilities.

Following Aliya's refund request, CTB had ten days, i.e., until October 29, 2014, to notify Aliya of any objection to Aliya's rejection of the receivables under section 14(f). CTB provided a response on that date; Aliya contends, however, that the response provided no substantive basis for the objection.[52] Specifically, it purportedly

40. *Id.,* ¶ 47.

41. *Id.*

42. *Id.*

43. *Id.,* ¶ 48.

44. *Id.*

45. *Id.,* ¶ 47.

46. *Id.,* ¶ 49.

47. *Id.,* ¶ 50.

48. *Id.*

49. *Id.,* ¶ 51.

50. *Id.,* ¶ 52.

51. *Id.*

52. *Id.,* ¶ 54.

did not identify any receivable that represented a claim submitted by an in-network physician.[53] In addition, CTB did not request a reasonable time to cure, despite having the right to do so under the terms of the third agreement.[54]

CTB's response also allegedly offered no assurance that it could pay Aliya $3,654,224.50.[55] Thus, Aliya did not transfer title to the receivables despite being ready, willing, and able to do so.[56] It contends its obligation to transfer title to the receivables to CTB was excused because it had a reasonable basis to believe that CTB would not remit the purchase price of the receivables as it had not given reasonable assurances it would. Alternatively, Aliya alleges that tender of the rejected receivables was excused because the law does not require a useless act.[57] CTB therefore had until November 3, 2014 to pay Aliya the $3,654,224.50. It did not do so. Instead, it asserted through an attorney that it did "not owe Aliya a dime." [58] Aliya contends that CTB's course of conduct shows it lacked sufficient funds to pay the $3,654,224.50 Aliya was owed for the rejected receivables.[59] It also asserts that CTB's response, i.e., that it did not owe the money, constituted a repudiation of Aliya's refund rights under section 14(f).

**D. Nickell's and CTB's Alleged Refusal to Honor Aliya's Right to Reject Receivables for Charges Associated With Already Paid or Settled Workers' Compensation Claims**

Aliya alleges that insurance companies will not pay receivables for medical services when there is no longer an ongoing workers' compensation claim; thus, the parties agreed that Aliya was permitted to reject any receivables and seek full refund of the purchase price if the receivables concerned services rendered after the underlying insurance claim had been settled, paid, or adjudicated.[60] Aliya contends that CTB sold it at least $2,074,577 of receivables representing medical services rendered after the underlying claim had been settled, paid, or adjudicated.[61] It contends it paid $145,356.95 for these receivables, and that after it rejected the receivables, CTB refused to refund the purchase price or issue a corresponding credit.[62]

**E. Nickell's and CTB's Alleged Sale of Receivables That Had Previously Been Collected In Full and Failed to Return the Purchase Price of These Receivables**

In or about June 2014, Aliya purportedly discovered that CTB had sold receivables to it that had already been paid by insurers; the purchase price for the receivables was $256,706.46.[63] Aliya contends the receivables were paid as early as January 2012, or ten months before CTB and Aliya entered into the first agreement. Because

---

53. *Id.,* ¶ 55.

54. *Id.*

55. *Id.,* ¶ 57.

56. *Id.*

57. *Id.,* ¶ 58.

58. *Id.,* ¶ 59.

59. *Id.* ¶ 60.

60. *Id.,* ¶ 67; Third Agreement, § 14(d)-(e).

61. FAC, ¶ 68.

62. *Id.,* ¶ 69.

63. *Id.,* ¶ 70.

CTB and Nickell had ample time to remove the paid receivables from the group being sold to Aliya, Aliya asserts they knew, or reasonably should have known, that they were selling receivables that had already been paid and hence were worthless. Aliya alleges that Nickell and CTB concealed the fact the receivables had been paid.[64]

Even if defendants did not act fraudulently, Aliya contends that CTB is contractually obligated to remit the funds paid on these receivables and/or issue a credit equal to the purchase price of the receivables at closing under section 12 of the third agreement.[65] That section, titled "reconciliation," provides:

> "All monies related to the Receivables, which have already been received by Provider and not properly recorded against the listing of the Receivables in Exhibit A, will be immediately credited to Buyer at the time of the closing. All monies received by Provider after the execution of this contract and before funding related to the Receivables, will be turned over to Buyer in good funds, at the closing. All monies received by Provider after the funding related to Receivables will be turned over to Buyer in good funds within 48 hours of receipt." [66]

On July 3, 2014, Aliya alleged exercised its rights under section 12 and made a claim for $256,706.46 based on receivables that had already been paid to CTB by insurers.[67] CTB purportedly did not respond until September 12, 2014, at which time it acknowledged that it had verified receipt of slightly less than the amount sought by Aliya, or $229,467.09.[68] CTB and Nickell purportedly refused to tender that amount, despite being obligated to do so under section 12.[69]

### F. Nickell's Alleged Diversion of Business That Belonged to Aliya

Beginning in or about October 2013, CTB allegedly began to divert urinalysis business in violation of the third agreement and non-competition clause.[70] Aliya contends that, to date, Nickell has diverted approximately $18 million of business to various shell companies controlled by him.[71] As evidence of this purported diversion, Aliya alleges that the monthly average of receivables from April to October 2013 was $5.2 million.[72] Suddenly, however, in November 2013, the volume dropped dramatically; the monthly average from November 2013 to August 2014 was only $1.6 million.[73] Nickell purportedly stated that the drop was a result of the fact that competitors had aggressively solicited CTB's business.[74] This explanation was purportedly false; Aliya asserts that in fact Nickell diverted toxicology business from CTB to other shell companies he owned.[75] It contends Nickell intended to divert business from the very beginning of the parties' relationship, and never intended to comply with the exclusivity provisions of the third agreement and non-competition clause.[76]

64. *Id.,* ¶ 73.

65. *Id.*

66. Third Agreement, § 12.

67. FAC, ¶ 75.

68. FAC, ¶ 75.

69. *Id.,* ¶ 76.

70. *Id.,* ¶ 80.

71. *Id.*

72. *Id.,* ¶ 81.

73. *Id.*

74. *Id.,* ¶ 82.

75. *Id.,* ¶¶ 82–83.

76. *Id.,* ¶ 84.

### G. Aliya's Termination of the Third Agreement and CTB's Withholding of Payments on Aliya's Receivables

As a result of CTB's allegedly wrongful actions, Aliya terminated the third agreement on November 5, 2014, giving CTB notice that it would not purchase further receivables in the future.[77] Aliya contends that given CTB's multiple breaches of the agreement, it was entitled to terminate. The first and second agreements were purportedly not terminated, however.[78]

Since Aliya terminated the third agreement, Nickell and CTB have purportedly begun to withhold payment on all of the receivables purchased by Aliya.[79] It alleges that to date, CTB has withheld more than $600,000 of payments owed to Aliya.[80] Nickell and CTB have also purportedly obstructed Aliya's efforts to collect and service the receivables it owns, and begun their own aggressive collection activities on those receivables to maximize the amount they can withhold and convert to their own use.[81]

Each of the parties' three agreements required that CTB open an account into which checks representing payments on receivables Aliya purchased were to be deposited. CTB was required to send the checks, uncashed, to the account on the day they were received from the insurance company. This was purportedly done to ensure that funds would not be commingled and that Aliya would not be subjected to risk in the event CTB became insolvent.[82] The agreements contained a "non-diversion guarantee" clause that required CTB to remit proceeds within 48 hours of receipt.[83] Aliya contends that the non-diversion guarantees survive termination of the third agreement.[84] CTB purportedly never opened the depository account, and failed to remit proceeds within 48 hours in direct violation of these provisions.[85] Instead, it purportedly deposited insurance checks in its own account and commingled the funds with its own.[86]

Aliya alleges that Nickell has used the receivable payments to fund other investments and businesses.[87] It provides one example that purportedly demonstrates how he has misused the funds:

"[I]n the beginning of 2014 he unilaterally decided to hold on to Aliya's funds for up to seven weeks before finally paying Aliya in two installments on February 27 ($515,758) and March 5 ($534,696). Based on information and belief, these dates coincide with Nickell's refinancing of a commercial building that he owns through one of his other entities (Kashiwa Court, LLC). Nickell refinanced this building in two separate transactions on February 26 and March 4, respectively, in each case the day prior to paying Aliya past overdue amounts. Nickell took the liberty to hold on to Aliya's funds at his discretion until such time that his refinance transactions had closed." [88]

---

77. *Id.*, ¶ 87.

78. *Id.*, ¶ 88.

79. *Id.*, ¶ 89.

80. *Id.*, ¶¶ 89, 99.

81. *Id.*, ¶ 89.

82. *Id.*, ¶ 91 (citing Third Agreement, §§ 4, 8).

83. *Id.*, ¶ 93 (citing First Agreement, § 12; Second Agreement, § 16; Third Agreement, § 19).

84. *Id.*

85. *Id.*, ¶¶ 92, 94.

86. *Id.*, ¶ 95.

87. *Id.*

88. *Id.*, ¶ 96.

When CTB eventually wired the funds to Aliya, it allegedly did so only after deducting certain "arbitrary costs that CTB chose to assess to Aliya." [89] Aliya alleges that CTB has charged more than $147,000 in "improper and bogus servicing costs." [90] Since November 5, 2014, moreover, CTB has purportedly continued to cash checks from insurers, and refused to provide any of the proceeds to Aliya. [91] On November 14, 2014, Aliya's attorney allegedly sent CTB's lawyer an email stating that Aliya had not received any funds from collections; he asked that CTB pay the funds and work with Aliya to establish a lockbox account. CTB's attorney allegedly responded that Nickell and CTB intended to withhold all funds collected on Aliya's receivables as a potential offset for alleged damages arising from its termination of the third agreement. [92]

Aliya contends that CTB has no right to withhold these funds under the agreements or Nevada law, [93] which governs the contracts. It maintains that under section 2 of the first and second agreements, and section 3 of the third agreement, all right, title and interest to he receivables was transferred to Aliya, and that CTB has no right to the proceeds. [94] Aliya also contends that, even if the agreements did not contain such a provision, Nevada law provides that once a debtor like CTB has sold "an account, chattel paper, payment intangible or promissory note [it] ... retain[s] [no] legal or equitable interest in the collateral sold." [95] Thus, it asserts that even if CTB has the right to collect the rejected receivables, the first and second agreements remain binding and hence it must remit proceeds collected on receivables subject to those agreements to Aliya. [96] It also contends that the non-diversion guar-

---

89. *Id.*, ¶ 97.

90. *Id.*

91. *Id.*, ¶ 98.

92. *Id.*, ¶ 100.

93. Nevada law governs the first, second, and third agreements. (See First Agreement, § 27; Second Agreement, § 30; Third Agreement, § 33.) The agreements also contain a provision requiring that "any action at law, suit in equity, or other judicial or non-judicial proceeding for the enforcement of th[e] Agreement[s] be instituted in the courts located in the State of Nevada, County of Clark." (*Id.*) Thus, venue in this district is improper. Defendants, however, have not raised improper venue as a basis for dismissal under Rule 12(b)(3), and have therefore waived the defense by failing to address in their motion to dismiss. Under Rule 12(h), the defense of improper venue is waived if omitted from a motion under the circumstances described in Rule 12(g). FED. R. CIV. PROC. 12(h). Rule 12(g) provides that "[a] motion under this rule may be joined with any other motion allowed by this rule." FED. R. CIV. PROC. 12(g). Rule 12(g) also provides that if a party makes

a motion under Rule 12, but omits a defense that the rule permits a party to raise by motion (e.g., improper venue), the defense cannot be raised in a subsequent motion. See *Misch on Behalf of Estate of Misch v. Zee Enterprises, Inc.*, 879 F.2d 628, 631 (9th Cir. 1989) ("Although a party may assert the defense of improper venue either as part of his responsive pleading or by separate motion, ... he waives the defense if not timely and properly raised"). "The purpose of Rule 12(g) is the consolidation of defenses in a single motion and the avoidance of successive, delaying motions." *Kina v. United Air Lines, Inc.*, No. CV 08 4358 PJH, 2008 WL 5071045, *3 (N.D.Cal. Dec. 1, 2008). Here, because defendants did not assert improper venue in their motion to dismiss, claim, they have waived their right to raise the defense at a later point in the litigation. See FED. R. CIV. PROC. 12(h); *Zee Enterprises, Inc.*, 879 F.2d at 631.

94. FAC, ¶ 101.

95. *Id.*, ¶ 102 (citing NEV. REV. STAT. § 104–9318(a)).

96. *Id.*, ¶ 103.

antee in the third agreement expressly survives termination of the agreement, and that CTB must therefore turn over payments received on receivables subject to that agreement as well.[97] As a consequence, Aliya maintains that it holds title to the receivables it purchased and is entitled to possession of the proceeds.[98] In addition to withholding proceeds from Aliya, Nickell and CTB also purportedly locked Aliya out of Conexem—the billing and collection software used to collect CBT's receivables. Defendants did so despite the fact that they were allegedly obligated to give Aliya access to the software under each of the parties' agreements.[99] Aliya relies substantially on Conexem's tools to manage the receivables it has purchased. It asserts:

> "Without access to Conexem virtually no employee duties can be performed sufficiently. For example, Aliya's employees are unable to collect on their assigned receivables because they do not have access to all the necessary information needed (accounting information, insurance correspondence and contact information, case history, notes, medical documents, patient information etc.). Without up-to-date accounting information the billing department cannot keep in accordance with current California Workers' Compensation law and deadlines, which depreciates the potential recovery amount leading to accrued losses. Without access to the court calendar for the claims, the legal department will not know about, nor will they be able to prepare for, court appearances, causing our receivables to be dismissed with potential for sanctions and losses." [100]

CTB has also allegedly failed to turn over mail or copies of mail received concerning the receivables.[101] Aliya contends that most insurers and the Workers' Compensation Appeals Board communicate information related to receivables by mail. Without access to mailed correspondence, Aliya lacks knowledge of receivable activity and cannot collect the amounts owed.[102] Aliya contends that CTB's failure to provide these documents violates its exclusive and irrevocable right to manage and collect the receivables. It cites section 24 of the third agreement, which states that CTB "hereby appoints Buyer as its attorney-in-fact to exercise at any time, at Buyer'[s] cost and expense, any or all of the following powers: to make collection efforts in Provider's name that Buyer deems necessary or desirable." [103] This right purportedly survives termination of the

---

**97.** *Id.,* ¶ 104. See also Third Agreement, § 19 ("[A]ny proceeds with the respect to the Receivables, will be promptly turned over to Buyer via wire transfer within 48 hours, along with the respective explanation of benefits/remittance advices, pertaining to such proceeds. This Non–Diversion Guaranty from Provider will survive this Agreement").

**98.** FAC, ¶ 105.

**99.** *Id.,* ¶¶ 106–07. Specifically, the agreements provide: "[Aliya's] purchase of the Receivables also includes (i) full title and ownership to Provider's books, records, billing and credit files, medical and patient records, chattel paper, and documents, related to the Receivables, together with all rights, remedies, liens, security Interests, guarantees and other

information necessary to collect the Receivables, including, without limitation, access to all records residing on the Provider's computer hardware, computer equipment and billing and collection software, including but not limited to, Provider's billing and collections system and [Aliya's] right to use such system(s) as [Aliya] requires to collect the Receivables." (See First Agreement, § 3; Second Agreement, § 3; Third Agreement § 4.)

**100.** FAC, ¶ 109.

**101.** *Id.,* ¶ 110.

**102.** *Id.,* ¶¶ 111–12.

**103.** Third Agreement, § 24.

third agreement.[104] Aliya thus asserts that CTB has breached the contracts by interfering with its right to collect receivables and with its right to transfer or assign receivables; it contends no buyer would purchase the receivables while Nickell and CTB continue their allegedly illegal acts.[105]

## II. DISCUSSION

### A. Legal Standard Governing Motions to Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory," or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988). The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir.1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir.1995).

The court need not, however, accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Thus, a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' ... A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); see also *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 ("Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir.2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly* ).

### B. Whether Aliya's Fraudulent Inducement Claim Must Be Dismissed

Under Nevada law,[106] "[t]o establish fraud in the inducement, [Aliya] must

---

**104.** FAC, ¶ 114 (citing Third Agreement, § 24 ("Provider agrees that the foregoing powers are coupled with an interest and that they shall be irrevocable until all Liens purchased by Buyer and all other amounts which may be owed by Provider to Buyer have been paid in full").)

**105.** *Id.*, ¶ 116.

**106.** Neither party addresses whether Nevada or California law applies to Aliya's tort claims. Both presume, however, that Nevada law applies. This appears to be correct. As noted, the contracts contain a choice of law provision stating that all "questions concerning the performance, construction, validity and Interpretation of this Agreement shall be governed by the laws of the State of Nevada." (First Agreement, § 27; Second Agreement, § 30; Third Agreement, § 33.) "Federal courts sitting in diversity must apply 'the forum state's choice of law rules to determine the controlling substantive law.'" *Fields v. Legacy Health Sys.*, 413 F.3d 943, 950 (9th Cir.2005) (quoting *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir.2002)). "California law

prove by clear and convincing evidence each of the following elements: (1) a false representation made by [defendants], (2) [defendants'] knowledge or belief that the representation was false (or knowledge that it had an insufficient basis for making the representation), (3) [defendants'] intention to therewith induce [it] to consent to the contract's formation, (4) [Aliya's] justifiable reliance upon the misrepresentation, and (5) damage to [Aliya] resulting from such reliance.... "[F]raud is never presumed; it must be clearly and satisfactorily proved." *J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*, 120 Nev. 277, 290–91, 89 P.3d 1009 (2004) (citing *Wohlers v. Bartgis*, 114 Nev. 1249, 1260–61, 969 P.2d 949 (1998)); see also *Bulbman Inc. v. Nevada Bell*, 108 Nev. 105, 110–11, 825 P.2d 588 (1992).

◼ Defendants argue that Aliya's fraudulent inducement claim is deficient because it is "nothing more than a contract claim masquerading as a tort claim."[107] They contend that Aliya fails to allege any damages caused by an independent injury that flowed from Nickell's and/or CTB's alleged misrepresentations.[108] Stated differently, defendants argue that the fraudulent inducement claim is barred by the economic loss rule. The Nevada Supreme Court has described the economic loss rule as follows:

"The economic loss doctrine draws a legal line between contract and tort liability that forbids tort compensation for 'certain types of foreseeable, negligently caused, financial injury.' The doctrine expresses the policy that the need for useful commercial economic activity and the desire to make injured plaintiffs whole is best balanced by allowing tort recovery only to those plaintiffs who have suffered personal injury or property damage. And it has been reasoned that such useful commercial activity could be deterred if those involved in it were subject to tort liability. Instead, when economic loss occurs as a result of negligence in the context of commercial activity, contract law can be invoked to enforce the quality expectations derived from the parties' agreement." *Terracon Consultants W., Inc. v. Mandalay Re-*

broadly construes this type of contractual choice-of-law provision." *Gen. Signal Corp. v. MCI Telecommunications Corp.*, 66 F.3d 1500, 1506 (9th Cir.1995).

In *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal.4th 459, 468, 11 Cal.Rptr.2d 330, 834 P.2d 1148 (1992), the California Supreme Court held that "[w]hen two sophisticated, commercial entities agree to a choice-of-law clause ..., the most reasonable interpretation of their actions is that they intended for the clause to apply to all causes of action arising from *or related to* their contract." *Id.* (emphasis added). The agreement in *Nedlloyd* provided that it was to be "*governed by* and construed in accordance with Hong Kong law and each party hereby irrevocably submit[ted] to the non-exclusive jurisdiction and service of process of the Hong Kong courts." *Id.* at 468–69, 11 Cal.Rptr.2d 330, 834 P.2d 1148 (emphasis original). The Court explained that "[t]he phrase 'governed by' is a broad

one signifying a relationship of absolute direction, control, and restraint. Thus, [it observed that] the clause reflect[ed] the parties' clear contemplation that 'the agreement' [would] be completely and absolutely controlled by Hong Kong law." *Id.* at 469, 11 Cal.Rptr.2d 330, 834 P.2d 1148. It determined, as a result, that plaintiff's breach of fiduciary duty claim was governed by Hong Kong law because it "exist[ed] only because of" the underlying agreement. *Id.*

The same is true here. All of the tort claims Aliya has asserted exist only because of the parties' contracts. In the absence of any argument by the parties, the court finds that the contractual choice of law provision controls, and that Nevada law applies to both contract and tort claims.

107. Motion at 7–8.

108. *Id.*

*sort Grp.*, 125 Nev. 66, 75, 206 P.3d 81 (2009).

Defendants cite no Nevada authority supporting the proposition that the economic loss rule applies to fraud claims, however. Instead, they cite one California district court decision, which applies California law, and which did not deal with a fraudulent inducement claim. In *Standard Platforms, Ltd. v. Document Imaging Sys. Corp.*, No. CIV. 93 20993 SW, 1995 WL 691868, *3 (N.D.Cal. Nov. 15, 1995), the court in fact expressly noted that the claim at issue was not a fraudulent inducement claim and, for that reason, did not arise from any independent duty that would support imposition of tort liability. See *id.* ("DISC's fraud claim is based upon Ricoh's performance of the warranty provisions of its agreement with Maxoptix. It bears no relation to a fraudulent inducement claim. As such, DISC's fraud claim is precluded because it does not arise from any independent duty imposed by principles of tort law").

[4] Nevada courts apply the economic loss rule more narrowly than California courts. In Nevada, "the doctrine bars *unintentional tort actions* when the plaintiff seeks to recover 'purely economic losses.'" *Terracon*, 125 Nev. at 73, 206 P.3d 81 (citing *Local Joint Exec. Bd. v. Stern*, 98 Nev. 409, 411, 651 P.2d 637 (1982) (emphasis added)). The Nevada Supreme Court thus has held that "[i]ntentional torts are not barred by the economic loss doctrine." *Halcrow, Inc. v. Eighth Jud. Dist. Ct.*, 302 P.3d 1148, 1154 n. 2 (Nev.2013) (citing *Terracon*, 125 Nev. at 72–73, 206 P.3d 81); see also *Las Vegas Metro. Police Dep't v. Harris Corp.*, No. 13–CV–01780–GMN, 2014 WL 3474278, *2 (D.Nev. July 11, 2014) (finding under *Halcrow* that the economic loss rule did not bar intentional tort claims). Consequently, defendants' asser-

tion that the economic loss rule bars Aliya's fraudulent inducement claim – or any of its intentional tort claims, for that matter–is unavailing.

 Defendants next contend that Aliya's fraudulent inducement claim is deficient because Aliya does not plead nonconclusory facts showing that the actions it purportedly took in reliance on Nickell's alleged misrepresentations proximately caused it damage.[109] Defendants maintain that no damage could have been caused by any alleged misrepresentation, because as pled, Aliya's damages flow entirely from CTB's purported refusal to repurchase properly rejected receivables under section 14(f) of the third agreement.[110] They assert that even if Nickell misrepresented the in-network status of the physicians, the misrepresentation alone did not cause damage because under section 14(f), Aliya had the right to require that CTB repurchase receivables reflecting claims by out-of-network physicians. Defendants argue that, if Aliya can show CTB refused to do so, its damage will have been caused by a breach of contract whether or not a misrepresentation was made. See *Rossberg v. Bank of America, N.A.*, 219 Cal.App.4th 1481, 1499, 162 Cal.Rptr.3d 525 (2013) ("If the defrauded plaintiff would have suffered the alleged damage even in the absence of the fraudulent inducement, causation cannot be alleged and a fraud cause of action cannot be sustained").

 *Rossberg* is a California Court of Appeal decision. Defendants cite no authority indicating that Nevada has adopted a similar rule. Under Nevada law, a plaintiff must allege "damage ... resulting from [its] reliance" on a purported misrepresentation. *J.A. Jones Const. Co.*, 120 Nev. at 290–91, 89 P.3d 1009. "Proximate

---

**109.** Motion at 8.

**110.** *Id.*

causation is generally an issue of fact for the jury to resolve," however. *Yamaha Motor Co., U.S.A. v. Arnoult,* 114 Nev. 233, 238, 955 P.2d 661 (1998) (citing *Nehls v. Leonard,* 97 Nev. 325, 328, 630 P.2d 258 (1981)). Aliya alleges that it would not have entered into the third agreement had it known that the majority of the receivables involved claims referred by out-of-network physicians.[111] It asserts that, at approximately the same time it entered into that agreement, it stopped purchasing receivables from another provider whose doctors were out-of-network because collection rates were substantially lower.[112] It also alleges that it had to dedicate an entire team of employees to determining the actual status of the receivables it had purchased from CTB;[113] this may have required capital expenditures and certainly involved substantial opportunity costs. Section 14(f) does not permit recovery of these types of damages. Thus, even assuming Nevada applies a rule similar to that discussed in *Rossberg,* defendants' argument that Aliya has not alleged damages caused by the purported misrepresentation as opposed to CTB's alleged breach of contract is unavailing.

In addition, Nevada law is clear that a plaintiff need not elect remedies in a situation such as this:

> "It is the law that one who has been fraudulently induced into a contract may elect to stand by that contract and sue for damages for the fraud. When this happens and the defrauding party also refuses to perform the contract as it stands, he commits a second wrong, and a separate and distinct cause of action arises for the breach of contract.... The courts of many states have recognized the rule that a suit on a contract

and a suit for fraud in inducing the contract are two different causes of action with separate and consistent remedies." *J.A. Jones Const. Co.,* 120 Nev. at 289, 89 P.3d 1009 (quoting *Bankers Trust Co. v. Pacific Employers Insurance Co.,* 282 F.2d 106, 110 (9th Cir. 1960)).

Accordingly, Aliya has sufficiently alleged proximate causation to survive a motion to dismiss.

■■■■ Third, defendants argue that Aliya's fraudulent inducement claim fails because the third agreement "specifically contemplates the possibility of the very outcome of which Aliya now claims it was not aware."[114] This appears to be an argument that Aliya has inadequately pled that its reliance on the purportedly fraudulent representations was reasonable. "[E]xcept in extreme cases, whether reliance is reasonable is a question of fact." See *Meredith v. Weilburg,* No. 13–CV–00277 RCJ, 2013 WL 5658181, *6 (D.Nev. Oct. 15, 2013) (citing *Blanchard v. Blanchard,* 108 Nev. 908, 912, 839 P.2d 1320 (1992)). Defendants contend that because section 14(f) permits Aliya to return receivables based on claims from out-of-network doctors, it must have known some of the receivables involved such providers, and could not reasonably have relied on any representation to the contrary.

Aliya counters that the fact the agreement contemplated a refund in the event a receivable or some receivables purchased during the five-year life of the agreement were based on claims by out-of-network providers does not render its reliance on Nickell's representation that all referring doctors were in-network unreasonable.[115] It alleges that section 14(f) was "intended

---

111. FAC, ¶ 122.

112. *Id.,* ¶¶ 36–37, 122.

113. *Id.,* ¶ 47.

114. Motion at 9.

115. Opposition at 16.

to guard against the possibility that some of the referring physicians were out-of-network for some receivables, not the vast majority of them," [116] and that, if anything, Nickell's guarantee of a refund gave Aliya even more reason to believe Nickell when he said referring doctors were in-network.[117] The third agreement provided that any rejected receivable would "not be part of th[e] [a]greement"; [118] as Aliya argues, this suggests that to the extent any receivable involved a claim by an out-of-network physician, the parties contemplated it would be a isolated exception rather than, as defendants contend, the rule. It makes little sense for CTB to agree to a provision exempting out-of-network claims when, as Aliya alleges, all—or nearly all—of the claims were actually out-of-network. Given the allegations in the complaint, i.e., that Nickell represented that all the physicians were in-network, the court cannot conclude in the context of a motion to dismiss that Aliya's reliance was unreasonable as a matter of law. See *Meredith*, 2013 WL 5658181 at *6; *Blanchard*, 108 Nev. at 912, 839 P.2d 1320.

■ Defendants next maintain that the fraudulent inducement claim must be dismissed because a fraud claim cannot be predicated on statements that involve future actions or events. The authority they cite does not stand for this proposition, however. Rather, the cases concern promissory fraud, i.e., promises of future performance, which are only actionable as fraud when it can be shown that the promisor never intended to perform. See *Bulbman, Inc. v. Nev. Bell*, 108 Nev. 105, 112, 825 P.2d 588 (1992) ("The mere failure to fulfill a promise or perform in the future ... will not give rise to a fraud claim

absent evidence that the promisor had no intention to perform at the time the promise was made"). Nonetheless, it appears that courts applying Nevada law require that misrepresentations concern presently existing, as opposed to future, facts. See *Archway Ins. Servs., LLC v. Harris*, No. 11–CV–1173 JCM CWH, 2014 WL 643785, *7 (D.Nev. Feb. 18, 2014) ("Opinions [as] to the future valuation of something do not 'satisfy the first necessary element of actionable fraud, misrepresentation of an existing fact, unless there existed a present intent not to attempt the future fulfillment of the promises,'" quoting *Fruit Indus. Research Found. v. Nat'l Cash Register Co.*, 406 F.2d 546, 549–50 (9th Cir.1969)). Aliya, however, does not allege that Nickell made false representations concerning future facts; it alleges that Nickell "represent[ed] to Erik Nord [ (Aliya's manager) ] ... that the doctors ordering toxicology services from CTB were in-network." [119] The allegedly actionable misstatement does not concern claims that would be submitted in the future by unnamed doctors; rather, it concerns doctors who were submitting claims to CTB at the time the representation was made. Indeed, other allegations in the complaint make this clear. Aliya pleads that "it is far-fetched to contend that Nickell had never inquired as to the 'in-network' status of his referring physicians, whom he had serviced for a long time and who had referred millions of dollars in business." [120] It also alleges that "CTB and Nickell knew or should have known that virtually all of [CTB's] referring physicians were 'out-of-network' while they were servicing the receivables and prior to the [t]hird [a]greement being executed based on the insurance company

---

116. FAC, ¶ 122.

117. Opposition at 16.

118. Third Agreement, § 14.

119. FAC, ¶ 38. See also *id.*, ¶ 48 ("Nickell again said that all physicians referring business to CTB were in-network providers of virtually every insurance company").

120. *Id.*, ¶ 63.

denials received by CTB." [121] These allega-tions clarify that the representation Aliya challenges concerned present, not future, facts. Consequently, defendants' motion must be denied to the extent it is based on an argument that the representations made concerned future events.

■ Finally, defendants argue that Aliya has failed to allege facts supporting its conclusion that "CTB and Nickell knew or should have known that virtually all of [the] referring physicians were 'out-of-net-work' while they were servicing the receiv-ables and prior to the [t]hird [a]greement being executed based on the insurance company denials received by CTB." [122] Knowledge can be alleged generally under Rule 9(b). See FED. R. CIV. PROC. 9(b) ("Malice, intent, knowledge, and other con-ditions of a person's mind may be alleged generally"). Allegations concerning knowledge must nonetheless be plausible under *Twombly* and *Iqbal*. See *Devaney v. Chester*, 813 F.2d 566, 568 (2d Cir.1987) ("Although Rule 9(b) permits knowledge to be averred generally, plaintiffs must still plead the events which they claim give rise to an inference of knowledge"); *Tanedo v. E. Baton Rouge Parish Sch. Bd.*, No. CV10–01172 JAK, 2012 WL 5447959, *8 (C.D.Cal. Oct. 4, 2012) (same).

Aliya has plausibly alleged knowledge. It pleads that as soon as it began to pro-cess collections, it discovered that insurers had previously declined to pay a large number of receivables because the refer-ring physician was out-of-network.[123] Ali-ya contends that the magnitude of the denials was such that CTB must have known that all, or at least a majority, of its referring physicians were *not* in-network. Aliya also alleges that "it is far-fetched to contend that Nickell had never inquired as to the 'in-network' status of his referring physicians, whom he had serviced for a long time and who had referred millions of dollars in business [to CBT] ... prior to the execution of the [t]hird [a]greement," especially since Nickell purportedly had "professional and/or personal relation-ship[s] with many of the physicians." [124] Accepting these allegations as true, as the court must, Aliya has plausibly alleged knowledge. If, as Aliya contends, CTB received out-of-network rejections for a large number of receivables prior to the parties' entry into the third agreement, it is plausible that CTB and Nickell knew that not all referring physicians were in-network. Accordingly, defendants' motion to dismiss fails to the extent premised on Aliya's pleading of knowledge.[125]

---

121. *Id.*

122. *Id.*

123. *Id.*, ¶¶ 44 ("Soon after Aliya commenced servicing its receivables, it noticed that insur-ance companies had denied payment of a large number of receivables because the refer-ring physician was out-of-network"); *id.*, ¶ 45 ("Aliya had not seen any such denials while Nickell's companies serviced the receivables because CTB did not provide Aliya with any documentation or correspondence from insur-ance companies regarding Aliya's receivables, such as correspondence explaining the reason a claim for payment had been denied, expla-nations of benefits, and so forth, even though it was obligated to do so. CTB only commu-nicated to Aliya the amount paid on the re-ceivables by the insurance companies and, eventually, remitted such payments to Aliya").

124. *Id.*, ¶¶ 63, 120.

125. Defendants also maintain that, to the ex-tent Aliya rests its fraudulent inducement claim on alleged misrepresentations by Nic-kell that occurred after the parties to perform the third agreement, it has failed to plead the "who, what, when, where, and how" of the purported fraud. (Motion at 11.) Defendants do not identify any alleged misrepresentations made after the term of the agreement com-menced. Nor does the court interpret Aliya's allegations as directed to post-contract-forma-tion misrepresentations; the gravamen of the

For all these reasons, the court denies defendants' motion to dismiss Aliya's fraudulent inducement claim.

### C. Whether Aliya's Fraudulent Concealment Claim Must Be Dismissed

■■■ To plead fraudulent concealment, plaintiff must allege that "(1) the defendant concealed or suppressed a material fact; (2) the defendant was under a duty to disclose the fact to the plaintiff; (3) the defendant intentionally concealed or suppressed the fact with the intent to defraud the plaintiff ...; (4) the plaintiff was unaware of the fact and would have acted differently if she had known of the concealed or suppressed fact; (5) and, as a result of the concealment or suppression of the fact, the plaintiff sustained damages." *Dow Chem. Co. v. Mahlum,* 114 Nev. 1468, 1485, 970 P.2d 98 (1998), overruled in part on other grounds in *GES, Inc. v. Corbitt,* 117 Nev. 265, 21 P.3d 11 (2001); see also *Couturier v. Am. Invsco Corp.,* 10 F.Supp.3d 1143, 1157 (D.Nev.2014) (same).

■■■ Aliya alleges that CTB and Nickell concealed three facts: (1) doctors providing toxicology services were out-of-network; (2) CTB had already received payment for more than $229,000 of the receivables it sold to Aliya; and (3) Nickell diverted toxicology receivables to other entities he owned.[126] Defendants argue that Aliya has failed adequately to allege a duty to disclose, and that the claim is deficient as a result.[127] A duty to disclose arises, *inter alia,* "where the defendant alone has knowledge of material facts which are not accessible to the plaintiff." *Epperson v. Roloff,* 102 Nev. 206, 213, 719 P.2d 799 (1986), overruled on other grounds in *GES, Inc.,* 117 Nev. 265, 21 P.3d 11. Additionally, a "special relationship" between the parties, such as a fiduciary or confidential relationship, may trigger a duty to disclose. *Mackintosh v. Jack Matthews & Co.,* 109 Nev. 628, 855 P.2d 549, 553–54 (1993). The first amended complaint does not allege that defendants had a duty to disclose because the parties were in a confidential or fiduciary relationship; accordingly, the court must determine whether a duty to disclose arose because CTB and Nickell purportedly knew facts that were inaccessible to Aliya.

■■■ The first amended complaint does allege, albeit in a conclusory manner, that the three facts that were purportedly concealed were "material facts known only to Nickell and CTB, that Aliya could not have reasonably discovered on its own."[128] The question is whether this conclusory allegation is supported by sufficient "non-conclusory 'factual content'" to be "plausibly suggestive of a claim entitling [Aliya] to relief." *Moss,* 572 F.3d at 969. Aliya has not adequately alleged that defendants concealed the out-of-network status of the vast majority of referring physicians, because it has not sufficiently pled that CTB and Nickell alone had access to the network status of the referring physicians. In fact, the complaint implies that Aliya reviewed the receivables it purchased in the first and second agreements—as distinguished from the third agreement—before purchasing them.[129] This gives rise to

---

claim is that defendants fraudulently induced Aliya to enter into the third agreement. Post-formation conduct could not have had this effect. To the extent such a claim is alleged, however, it is not alleged with particularity. The court therefore dismisses the fraudulent inducement claim to the extent it is based on post-contract-formation representations. Should Aliya wish to assert such a claim, it

can amend its complaint to plead allegations that satisfy Rule 9(b).

**126.** FAC ¶¶ 126–128.

**127.** Motion at 12.

**128.** FAC, ¶ 129.

**129.** *Id.,* ¶ 39 (stating that "Aliya agreed to purchase all CTB's receivables [in the third

an inference that it had an idea which doctors routinely referred patients to CTB, and could have consulted and/or investigated these physicians to determine whether or not they were in-network. Ailya also could have elected to conduct due diligence; that it did not do so does not place the network status of referring physicians within defendants' exclusive knowledge. Accordingly, the court finds that Aliya has failed adequately to allege a fraudulent concealment claim based on the network status of referring physicians.

The same is true with respect to Aliya's allegation that CTB concealed it had received payment for more than $229,000 of receivables that it sold to Aliya. Aliya alleges that CTB initially handled collection of the receivables, and that it sold $229,000 of receivables on it had already collected without disclosing that fact to Aliya.[130] Because CTB was handling collections pursuant to the parties' agreement, Aliya argues it "had no way of knowing that Nickell and CTB [had] received $229,000 that they did not tell Aliya about."[131] The court cannot agree. As noted, Aliya could have elected to conduct due diligence. Its failure to do so does not mean that the fact certain claims had already been paid was within defendants' exclusive knowledge. Thus, Aliya fails adequately to allege that defendants had a duty to disclose that they had already received payment of $229,000 in receivables.

▮ The court reaches a different conclusion with respect to Aliya's allegations that Nickell purportedly diverted toxicology receivables from CTB to other entities he owned. None of the facts alleged in the complaint give rise to an inference that Aliya could or should have known that Nickell was using entities he controlled to divert business from CTB, and thus from Aliya. Defendants contend that the indemnification agreement makes it clear that Aliya knew business might be diverted; the indemnity agreement—which was executed well before the alleged concealment occurred—does not make any reference to the fact Nickell was or intended to divert assets, however. It thus does not foreclose the possible existence of a duty to disclose. Based on Aliya's allegations, the court concludes that it has adequately alleged CTB and Nickell had exclusive knowledge of the fact Nickell was purportedly diverting assets from CTB to other entities he owned. Thus, it has sufficiently pled that defendants had a duty to disclose these facts under Nevada law.

The court nonetheless finds that Aliya's fraudulent concealment claim is deficient to the extent based on Nickell's purported diversion of toxicology receivables from CTB to other entities he owned, because Aliya fails plausibly to plead the third element of a fraudulent concealment claim, i.e., that CTB and Nickell "intentionally concealed or suppressed the fact[s] with the intent to defraud [it]." *Dow Chem. Co.*, 114 Nev. at 1485, 970 P.2d 98. None of Aliya's allegations affirmatively plead that Nickell intended to divert business from CTB to other entities. In fact, the complaint alleges a plausible, non-fraudulent explanation for the decline in physician referrals to CTB:

---

agreement] sight-unseen, without conducting an otherwise time consuming due diligence review of each receivable each month. In exchange for giving up the right to pre-purchase due diligence, CTB and Nickell promised Aliya an absolute right to return any and all receivables [i.e., § 14] that did not meet certain criteria set forth in the Third Agree-

ment for a full refund of the applicable purchase price."). The first and second agreements do not include a provision analogous to § 14.

130. *Id.,* ¶ 75.

131. Opposition at 18.

"When Aliya approached Nickell in November 2013 about the sudden drop in business, Nickell ... stated that competitors were aggressively taking away his business. He ... also suggested in numerous meetings that if Aliya would only agree to pay a higher fee for the receivables going forward, CTB and Nickell would be able to compete and win the business back." [132]

Although Aliya alleges in conclusory fashion that, "[b]ased on information and belief, from the very beginning, Nickell intended to divert the business as soon as it would be to his benefit," [133] this is insufficient to plead intent to defraud plausibly.[134] *Singh v. Asiana Airlines,* No. 14–CV–05556 JSC, 2015 WL 983821, *7 (N.D.Cal. Mar. 4, 2015) ("Other than this conclusory allegation that Defendant 'had no intention of performing the contract in good faith,' or other purely conclusory statements that Defendant acted 'with malice,' the complaint is absent factual allegations that plausibly establish that Defendant had an intent to defraud Plaintiff"); *Digby Adler Grp., LLC v. Mercedes–Benz U.S.A., LLC,* No. 14–CV–02349 TEH, 2015 WL 1548872, *4 (N.D.Cal. Apr. 7, 2015) (" '[C]onclusory statements about' intent to defraud, 'without corroborating factual allegations,' are 'insufficient, standing alone, to adequately allege' a fraud claim," quoting

*Mohebbi v. Khazen,* 50 F.Supp.3d 1234, 1252 (N.D.Cal.2014)); *Bowen v. Access Am.,* No. CV 12–3083 MM, 2012 WL 4761891, *2 (N.D.Cal. Oct. 5, 2012)("[The complaint] includes no more than conclusory assertions that defendants ... 'concealed or suppressed these facts,' ... with 'the intent to defraud and induce [Bowen] to act.' Accordingly, the [fraud claim] is subject to dismissal").[135]

Accordingly, despite the fact that Aliya adequately alleged a duty to disclose that Nickell was purportedly diverting toxicology receivables to other entities, the fraudulent concealment claim must be dismissed because it fails plausibly to allege intent to defraud with respect to these purportedly concealed facts.

**D. Whether Aliya's Promissory Fraud Claim Must Be Dismissed**

 " 'Promissory fraud,' as it is sometimes called, is simply a fraud claim where the fact about which the tortfeasor deceives the victim is the tortfeasor's intention not to perform from the outset." *Heldenbrand v. Multipoint Wireless, LLC,* No. 12–CV–01562 RCJ, 2012 WL 5198479, *4 (D.Nev. Oct. 18, 2012) (citing *Bulbman, Inc. v. Nev. Bell,* 108 Nev. 105, 111–12, 825 P.2d 588 (1992)) (in turn citing *Webb v. Clark,* 274 Or. 387, 546 P.2d 1078 (1976)). Thus, "[t]he standard elements of fraud

**132.** FAC, ¶ 82.

**133.** *Id.,* ¶ 85.

**134.** At the hearing, Aliya cited only this allegation in arguing that its fraudulent concealment claim was not deficient. Based on the authority discussed above, the court cannot agree.

**135.** In addition, as respects the purported concealment of the fact that $229,000 of receivables had been paid by the time they were sold to Aliya, Aliya alleges only that "CTB and Nickell knew or should have known that at

the time each [a]greement was entered into, at the closing, and on each funding day for the receivables at hand, that these receivables had already been paid in full." (FAC, ¶ 76.) This allegation is also wholly conclusory and fails plausibly to allege intent to defraud. Given that Aliya purchased more than $83 million of receivables in total, the court cannot conclude that the fact defendants sold slightly more than $200,000 of receivables they had already collected supports an inference of intent to defraud. (FAC, ¶ 34.) Given the volume of receivables purchased and sold, the sale could just as easily have been the product of an error or negligence.

apply: (1) a false representation by the defendant; (2) the defendant's knowledge or belief that the representation is false (or [that it had an] insufficient basis for making the representation); (3) the defendant's intention to induce reliance; (4) the plaintiff's justifiable reliance; and (5) resulting damage." *Id.*

Aliya contends that CTB and Nickell made two promises they did not intend to honor: (1) that Aliya could return out-of-network receivables for a refund;[136] and (2) that they would set up a lockbox account in which they would deposit all checks they received from insurers as payment on Aliya's receivables.[137] Defendants contend this claim must be dismissed for the same reasons as the fraudulent inducement claim. The court denied defendants' motion to dismiss that claim, however, and thus this argument is unavailing.

▆▆▆▆ Second, defendants argue that Aliya has failed adequately to allege that CTB and Nickell had no intention of performing either of the promises. "The mere failure to fulfill a promise or perform in the future ... will not give rise to a fraud claim absent evidence that the promisor had no intention to perform at the time the promise was made." *Bulbman, Inc.*, 108 Nev. at 112, 825 P.2d 588; see *Heldenbrand*, 2012 WL 5198479 at *4 (dismissing where plaintiff did not "plausibly allege[ ] that Defendants concealed an intention not to perform (promissory fraud)"). Aliya's allegations concerning intent to perform are not particularly detailed. It alleges "on information and belief, [that] Nickell and CTB promised that CTB would perform under the [t]hird [a]greement when, in fact, [they] had no intention of performing as agreed."[138]

Aliya contends it has alleged more than the mere failure to fulfill a promise or perform in the future; specifically, it maintains that it has alleged other facts that support the conclusion that CTB and Nickell did not intend to perform either of the alleged promises when they were made. Aliya maintains it has pled facts that support an inference that defendants did not intend to refund payments for out-of-network receivables because it alleges that "Nickell knew the vast majority of doctors were out-of-network."[139] The court agrees with Aliya. The fact that a majority of the receivables purportedly reflected out-of-network claims plausibly suggests that Nickell and CTB had no intention of performing their promise that Aliya could return out-of-network receivables. If, as alleged, they knew that a majority of the doctors were out-of-network, yet intended to perform their promise to accept a return of out-of-network receivables, this would have made the agreement almost illusory because there would have been so few receivables that were covered by the contract. This gives rise to a plausible inference that defendants did not intend to perform their promise that Aliya could return out-of-network receivables. As a result, Aliya has adequately alleged a promissory fraud claim based on this promise.

▆▆▆▆ Aliya also contends that CTB's and Nickell's lack of intent to perform their promise to set up a lockbox account is demonstrated by their failure even to attempt performance.[140] As an initial matter, the complaint does not allege that CTB and Nickell never attempted to perform this promise; thus, even were Aliya correct that a failure even to attempt per-

---

136. FAC, ¶¶ 66, 136.

137. *Id.*, ¶¶ 91–92.

138. *Id.*, ¶ 136.

139. Opposition at 20 (citing FAC, ¶¶ 44–45).

140. *Id.*

formance evidences an intent not to perform at the time a promise is made, the allegations would be deficient. In addition, there is no Nevada authority holding that "failure even to attempt performance" suffices to plead lack of intent to perform at the time a promise is made. In *Tenzer v. Superscope, Inc.,* 39 Cal.3d 18, 30, 216 Cal.Rptr. 130, 702 P.2d 212 (1985), the California Supreme Court held that "fraudulent intent has been inferred from such circumstances as defendant's insolvency, his hasty repudiation of the promise, his failure even to attempt performance, or his continued assurances after it was clear he would not perform." *Id.* Aliya cites no authority indicating that the Nevada Supreme Court would likely reach a similar result; even had it done so, Aliya's allegations belie any argument that CTB and Nickell "fail[ed] even to attempt performance." It contends that CTB and Nickell never attempted to open the account despite Aliya's numerous requests that they do so.[141] The complaint, however, does not allege that CTB and Nickell failed even to attempt to perform. The only allegation concerning the lockbox is paragraph 92, which states that

> "CTB has never set up this depository account, even though Aliya raised the issue with Nickell on multiple occasions, repeatedly requested that the account be set up, and sent Nickell the necessary bank forms for execution so that the account could be established." [142]

This allegation contains no facts as to whether CTB and Nickell attempted to perform. The first amended complaint therefore falls short of pleading that defendants made no attempt to perform either of the purported promises. The only non-conclusory allegations supporting this aspect of the promissory fraud claim indicate only that CTB and Nickell did not

perform. As noted, this is insufficient to plead the claim. See *Bulbman, Inc.,* 108 Nev. at 112, 825 P.2d 588 ("[t]he mere failure to fulfill a promise to perform in the future, however, will not give rise to a fraud claim absent evidence that the promisor had no intention to perform at the time the promise was made"); see also *Heldenbrand,* 2012 WL 5198479 at *4 (dismissing where plaintiff did not "plausibly allege[ ] that Defendants concealed an intention not to perform (promissory fraud)"); *Parker v. Bank of Am., NA,* No. 12 CV 126 RCJ VPC, 2012 WL 3222150, *3 (D.Nev. Aug. 3, 2012) (same); cf. *Cundiff v. Dollar Loan Ctr. LLC,* 726 F.Supp.2d 1232, 1238 (D.Nev.2010) (holding that "a misrepresentation as to future performance cannot be negligent because such a statement is either fraudulent, i.e., the person never held that intention at the time he made the statement, or it was not a misrepresentation at all, the person simply later failed to perform as promised").

For these reasons, Aliya's promissory fraud claim must be dismissed to the extent it is based on a purported promise to set up a lock box account. The court denies defendants' motion to dismiss, however, to the extent the claim is based on CTB's and Nickell's promise to refund out-of-network receivables.

## E. Whether Aliya's Negligent Misrepresentation Claim Must Be Dismissed

Nevada has adopted the definition of negligent misrepresentation found in section 552 of the RESTATEMENT (SECOND) OF TORTS. See *Barmettler v. Reno Air, Inc.,* 114 Nev. 441, 448, 956 P.2d 1382 (1998). To state a negligent misrepresentation claim, a plaintiff must plead:

---

141. *Id.,* ¶ 92.

142. *Id.*

"1) a representation that is false; 2) that the representation was made in the course of the defendant's business or ... any action in which he has a pecuniary interest; 3) the representation was for the guidance of others in their business transactions; 4) the representation was justifiably relied upon; 5) that such reliance resulted in pecuniary loss to the relying party; and 6) that the defendant failed to exercise reasonable care or competence in obtaining or communicating the information."

*Tene v. BAC Home Loan Servicing LP*, No. 11–CV–01095 KJD, 2012 WL 222920, \*3 (D.Nev. Jan. 25, 2012) (quoting *G.K. Las Vegas Limited Partnership v. Simon Property Group, Inc.*, 460 F.Supp.2d 1246, 1262 (D.Nev.2006)).

 Aliya bases its negligent misrepresentation claim on the same facts that support its fraudulent inducement claim, i.e., that "Nickell and CTB while in the course of their business, profession, or employment represented to Erik Nord, manager of Aliya, in telephone conversations and at meetings in Nickell's office that the doctors ordering toxicology services from CTB were in-network." [143] It asserts that the representation was false because nearly all of the doctors were out-of-network.[144] Defendants contend the claim fails for the same reasons the fraudulent inducement claim fails, i.e., because Aliya has failed to plead reliance, proximate causation, and damages adequately.[145] The court, however, has concluded differently. Thus, this argument is unavailing.

 Defendants also assert that Aliya does not allege a duty of care. As reflected in the legal standard they cite in their moving papers, however, Nevada does not appear to require that a defendant owe plaintiff a duty of care where "the representation was made in the course of the defendant's business or ... any action in which he has a pecuniary interest." *G.K. Las Vegas Limited Partnership*, 460 F.Supp.2d at 1262. This is because "where only pecuniary loss results, liability for negligent misrepresentation is not based on general duty rules"; instead, "[l]iability is only imposed on a party who has supplied false information, where that information is for the guidance of others and where the party knows that the information will be relied upon by a foreseeable class of persons." *Halcrow, Inc.*, 302 P.3d at 1153.

In any event, in cases not involving economic loss, the Nevada Supreme Court has held that a duty of care capable of supporting the imposition of liability for a gent misrepresentation is a special financial harm claim for which tort recovery is permitted because without such liability the law would not exert significant financial pressures to avoid such negligence"). Defendants do not cite any authority suggesting that the negligent misrepresentation exception to the economic loss doctrine does not apply here, and the alleged misrepresentations clearly concerned financial matters. The court therefore declines to dismiss the negligent misrepresentation claim on the basis of the economic loss rule. See *Phillips v. Dignified Transition Solutions*, No. 13–CV–02237 GMN, 2014 WL 4294972, \*7 (D.Nev. Aug. 28, 2014) (negligent misrepresentation claim was not subject to dismissal under economic loss rule).

---

143. FAC, ¶ 143.

144. *Id.*, ¶ 144.

145. Motion at 14. Although not an intentional tort, negligent misrepresentation claims are exempt from the economic loss rule under Nevada law. The Nevada Supreme Court explained in *Halcrow* that there are "exceptions to the economic loss doctrine for negligent misrepresentation claims in a certain category of cases when strong countervailing considerations weigh in favor of imposing liability." 302 P.3d at 1153. "These types of cases encompass economic loss sustained, for example, as a result of ... negligent misstatements about financial matters." *Id.* See also *Terracon*, 125 Nev. at 77, 206 P.3d 81 ("negli-

negligent misrepresentation can be "attributable to the contract between [two parties]." *Elizabeth E. v. ADT Sec. Sys. W., Inc.*, 108 Nev. 889, 893, 839 P.2d 1308 (1992). In *Elizabeth E.*, the court found that the existence of a contract between ADT and Taco Bell was sufficient to extend a duty of care to a non-signatory third party. See *id.* ("As a result of the contract and the serious nature of the services provided by ADT under the contract, we have no difficulty recognizing ADT's duty of care to Taco Bell and its employees not to misrepresent the capabilities of the alarm system installed at the location where Elizabeth worked on the occasion of her injuries"). This is because a "special relationship arising from contract can serve as basis for liability for economic or physical injury resulting from reliance upon negligent misrepresentation." *Id.* (citing 65 C.J.S. NEGLIGENCE § 20 (1966)). In this case, as in *Elizabeth E.*, the court has "no difficulty recognizing [CTB's and Nickell]'s duty of care to [Aliya] not to misrepresent" the nature of the receivables being sold. *Id.*

Accordingly, defendants' motion to dismiss Aliya's negligent misrepresentation claim is denied.

**F. Whether Aliya's Conversion Claim Must Be Dismissed**

 "A conversion is defined as a distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title or rights therein or in derogation, exclusion, or defiance of such title or rights." *Wantz v. Redfield*, 74 Nev. 196, 198, 326 P.2d 413 (1958); see *Tai Si Kim v. Kearney*, No. 09 CV 02008 PMP, 2010 WL 3603651, *4 (D.Nev. Aug. 30, 2010) (same). "An exercise of the rights of ownership sufficient to constitute conversion is present when a tortfeasor takes possession, sells the property, and pockets the proceeds of the sale." *Pelletier v. Pelletier*, 103 Nev. 408, 411, 742 P.2d 1027 (1987).

 Defendants contend that Aliya's conversion claim must be dismissed because it fails to allege a specific and definite sum that is capable of identification. They contend the claim is based on CTB's alleged withholding of "checks" constituting payments of receivables, and that Aliya does not plead the overall sum converted. Under Nevada law, money can be the subject of a conversion claim. See *Lopez v. Javier Corral, D.C.*, No. 51541, 2010 WL 5541115, *6 (Nev. Dec. 20, 2010) (Unpub.Disp.) ("From the evidence that was presented at trial, the district court could have reasonably inferred that Lopez wrongfully exerted dominion over Corral's money, which was in derogation of Corral's rights in the property. Therefore, we conclude that substantial evidence supports the district court's finding that Lopez committed conversion").[146]

To be the subject of a conversion claim, however, "the money, or the specific amount of money, [must be] identifiable,

---

146. Unpublished decisions of the Nevada Supreme Court are not precedent. See Nᴇᴠ. Sᴜᴘ. Cᴛ. R. 123 ("An unpublished opinion or order of the Nevada Supreme Court shall not be regarded as precedent and shall not be cited as legal authority except when the opinion or order is (1) relevant under the doctrines of law of the case, res judicata or collateral estoppel; or (2) relevant to a criminal or disciplinary proceeding because it affects the same defendant or respondent in another such proceeding"). "Although the court is not bound by unpublished decisions of [] state courts, unpublished opinions that are supported by reasoned analysis may be treated as persuasive authority." *Scottsdale Ins. Co. v. OU Interests, Inc.*, No. C 05–313 VRW, 2005 WL 2893865, *3 (N.D.Cal. Nov. 2, 2005) (citing *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n. 8 (9th Cir.2003) ("[W]e may consider unpublished state decisions, even though such opinions have no precedential value")).

such as where it is earmarked, or set aside in a separate account, or otherwise identifiable." *Hester v. Vision Airlines, Inc.*, No. 09–CV–0117 RLH RJJ, 2011 WL 856871, *3 (D.Nev. Mar. 9, 2011).

■ Here, Aliya does not allege simply that money has been converted; it contends that receivables it purchased have been converted. Numerous courts have found that accounts receivable can be converted. See *Laguna Commercial Capital, LLC v. Se. Texas EMS, LLC*, No. CV 11–09930–MMM (PLAx), 2011 WL 6409222, *4–6 (C.D.Cal. Dec. 21, 2011) (entering a preliminary injunction, *inter* alia, on a conversion claim arising from a factoring agreement where the seller was allegedly keeping receivables from the buyer); *Pioneer Commercial Funding Corp. v. United Airlines, Inc.*, 122 B.R. 871, 884–85 (S.D.N.Y.1991) (holding that accounts receivable can be converted because "receivables, while resulting from accounting entries, nevertheless represent tangible, marketable assets which can be sold, secured, or traded"); *Medi–Cen Corp. v. Birschbach*, 123 Md.App. 765, 720 A.2d 966, 969–72 (1998) (holding that accounts receivable can be converted where they are "represented by hard copies or electronic data, kept in the normal course of business").

Without citation to authority, defendants maintain that the conversion claim fails because the receivables are not specifically identified by amount. The only case applying Nevada law that the court has been able to locate reached the opposite conclusion, albeit on facts somewhat different than those of this case. In *Hester*, 2011 WL 856871 at *3, the court held that where a defendant "received money specifically earmarked to be given to its flight crews, but kept it for its own benefit, it ha[d] converted the property (money)." Other federal courts have more directly rejected defendants' contention, concluding that receivables are, in fact, readily identifiable, e.g., by resort to the agreements under which they were purchased or sold. See *Pioneer Commercial Funding Corp.*, 122 B.R. at 884 ("United correctly cites the general rule that the mere establishment of a debtor/creditor relationship is insufficient to create a cause of action for conversion when the debtor fails to satisfy its obligations.... Pioneer is not simply alleging the conversion of money through the failure to satisfy a debt, but rather, is claiming the conversion of funds represented by accounts receivable held at ACH on its behalf. This distinction is not merely a matter of semantics since these receivables, while resulting from accounting entries, nevertheless represent tangible, marketable assets which can be sold, secured, or traded. Indeed, Pioneer, and thereafter the Bank Group, secured its interest in Presidential's receivables held at ACH in order to obtain a priority over these funds. Thus, when United kept the funds it allegedly was required to transfer to ACH, it allegedly violated Pioneer's proprietary rights in a specific and identifiable piece of property, namely Presidential's accounts receivable"). On the basis of this authority, the court concludes that Aliya has sufficiently identified the allegedly converted property, i.e., the receivables it purchased under the first, second and three agreements. Defendants' motion to dismiss on this basis is therefore denied.

■ Defendants next argue that Aliya's conversion claim fails because it is no more than a disguised contract claim. They cite *In re Bailey*, 197 F.3d 997 (9th Cir.1999), for the proposition that "a mere contractual right of payment, without more, does not entitle the obligee to the immediate possession necessary to establish a cause of action for the tort of conversion." *Id.* at 1000; see also *Gerawan Farming, Inc. v. Rehrig Pac. Co.*, No.

1:11–cv–01273 LJO BAM, 2012 WL 691758, *6 (E.D.Cal. Mar. 2, 2012) (where "there is nothing to suggest that the ... payments due to [plaintiff] amount[ ] to anything more than a contractual right to payment," a conversion claim cannot lie). Aliya does not merely assert a contractual right to payment, however. It asserts a contractual right to the receivables themselves. Cf. RESTATEMENT (SECOND) OF TORTS § 242, cmt. a (1965) ("A document is a chattel and is, therefore, itself the subject of property. As such, it may be the subject of a conversion which makes the actor liable"); see also id. cmt. c ("Where a negotiable instrument is converted, the measure of the converter's liability is presumed to be the face amount of the instrument. The presumption may, however, be rebutted by proof of such facts as the insolvency of the maker or drawer, which may reduce or entirely negative the face value"); *id.*, illustration 1 (theft of a check). The receivables, as noted, are sufficiently identifiable and, as alleged in the complaint, Aliya's property. Defendants' reliance on *In re Bailey* is therefore unavailing.

■■■ The court therefore finds that Aliya has plausibly alleged a conversion claim against CTB. Aliya also purports to state the claim against Nickell. As explained *infra* in the court's discussion of Aliya's UCL claim against Nickell, however, Aliya does not plausibly plead that Nickell, as opposed to CTB, converted or otherwise wrongfully retained possession of its funds or the receivables. Aliya asserted at the hearing that Nickell can be liable for conversion because he directed that funds be converted by CTB and others. It cited two cases, neither of which applies Nevada law, as support for this assertion. See *Receivables Exch., LLC v. Suncoast Tech., Inc.*, No. CV 10–4152, 2012 WL 1019623, *8 (E.D.La. Mar. 26, 2012) ("It has long

been established in Louisiana that a corporate officer may be personally liable for conversion committed on behalf of the corporation"); *Hirsch v. Phily,* 4 N.J. 408, 73 A.2d 173, 176–77 (1950) (holding corporate officers personally liable for withholding funds due to a factor in connection with purchased receivables).

It appears Nevada law accords with these cases to the extent they hold that a corporate officer can be held liable for directing the commission of a tort. See *Pocahontas First Corp. v. Venture Planning Grp., Inc.,* 572 F.Supp. 503, 508 (D.Nev.1983) ("There is no doubt that an individual who commits a tort while acting in the capacity of a corporate officer may be held personally liable"). The problem, however, is that, in addition to failing plausibly to plead that Nickell himself converted funds, Aliya also does not plausibly allege that he directed CTB or other Nickell entities to convert any funds. At the hearing, Aliya confirmed that its only allegations concerning Nickell's direction of the conversion are paragraphs 105 and 117, which state only that "Nickell has directly authorized, participated in, and directed this interference with Aliya's rights." [147] This allegation is conclusory and fails to satisfy Rule 8, *Twombly,* and *Iqbal.* Thus, to the extent alleged against Nickell, the conversion claim is deficient and must be dismissed.

For all of these reasons, the court denies defendants' motion to dismiss Aliya's conversion claim alleged against CTB, but dismisses the claim against against Nickell.

**G. Whether Aliya's Intentional Interference With Contractual Relations Claim Must Be Dismissed**

■■■ "In an action for intentional interference with contractual relations, a

**147.** FAC, ¶¶ 105, 117.

plaintiff must establish: (1) [the existence of] a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage." *J.J. Indus., LLC v. Bennett,* 119 Nev. 269, 274, 71 P.3d 1264 (2003). Under Nevada law, "a party cannot, as a matter of law, tortiously interfere with its own contract." *Blanck v. Hager,* 360 F.Supp.2d 1137, 1154 (D.Nev.2005); *Bartsas Realty, Inc. v. Nash,* 81 Nev. 325, 327, 402 P.2d 650 (1965) ("Of course the first theory, that of tortious interference with the oral agreement is wholly unsound, for the defendants' breach of their own contract with the plaintiff is not a tort"). Similarly, "agents acting within the scope of their employment, i.e. the principal's interest, do not constitute intervening third parties, and therefore cannot tortiously interfere with a contract to which the principal is a party." *Blanck,* 360 F.Supp.2d at 1154 (citing *Alam v. Reno Hilton Corp.,* 819 F.Supp. 905, 911–12 (D.Nev.1993)).

■ Aliya asserts this claim only against Nickell. Defendants argue the claim must be dismissed because Nickell is the president and CEO of CTB, i.e., an agent of CTB, and therefore cannot tortiously interfere with CTB's contract with Aliya. *Blanck,* 360 F.Supp.2d at 1154. Aliya counters that Nickell diverted money solely for the benefit of *other* entities he controlled, not CTB; thus, it asserts he was not acting within the scope of his agency for CTB, or in its best interests. The only allegation in the complaint that supports this assertion is paragraph 167. That paragraph states that "by diverting receivables to his other businesses, Nickell was not acting in the interests of CTB – he was acting in his own interest or in the

interest of those other companies." [148] There is no factual content in this paragraph, however. Aliya simply pleads the legal conclusion that Nickell was not acting in the interests of CTB. This will not suffice under *Iqbal* and *Twombly.* See *Moss,* 572 F.3d at 969 ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly* ). Because the complaint fails plausibly to allege that Nickell was not acting as an agent of CTB, the intentional interference claim is deficient and must be dismissed.

■ This claim fails for a more fundamental reason as well. "The defendant's 'mere knowledge of the contract is insufficient to establish that the defendant intended or designed to disrupt the plaintiff's contractual relationship; instead, the plaintiff must demonstrate that the defendant intended to induce the other party to breach the contract with the plaintiff.'" *JPMorgan Chase Bank, N.A. v. KB Home,* 740 F.Supp.2d 1192, 1197–98 (D.Nev.2010) (quoting *J.J. Indus., LLC,* 119 Nev. at 274, 71 P.3d 1264). As noted in the court's discussion of the fraudulent concealment claim, there are no allegations in the complaint that plausibly allege Nickell intended to divert business—or, in fact, that he diverted business—from CTB. To the contrary, the complaint alleges a plausible, non-fraudulent explanation for the decline in physician referrals to CTB, i.e., "that competitors were aggressively taking away [CTB's] business." [149] The only allegation concerning Nickell's intent in the complaint is the conclusory assertion that "[b]ased on information and belief, from the very beginning, Nickell intended to

---

148. FAC, ¶ 167.

149. FAC, ¶ 82.

divert the business as soon as it would be to his benefit." [150] This is insufficient plausibly to plead intent to interfere with CTB's contract with Aliya. See *Celebrity Chefs Tour, LLC v. Macy's, Inc.*, No. 13 CV 2714 JLS KSC, 2014 WL 1660674, *7 (S.D.Cal. Apr. 25, 2014) ("However, the Complaint in no way suggests that Whirlpool urged LEC to hang on to the CCT Assets. On the face of the Complaint, it is just as possible that LEC decided on its own to refuse to return the CCT Assets. Thus, Plaintiffs fail to allege either Whirlpool's intentional acts or causation. Accordingly, Plaintiffs fail to state a plausible claim for intentional interference with contractual relations, and thus the Court [grants] Whirlpool's MTD as to this claim"); *GRK Holdings, LLC v. First Am. Title Ins. Co.*, No. CV10–0050 PHX DGC, 2010 WL 3940575, *8 (D.Ariz. Oct. 6, 2010) (dismissing an intentional interference claim where "there [were] absolutely no facts in support of GRK's conclusory assertions that the Quarles Defendants acted with improper intent and filed suit to interfere with GRK's contract"); cf. *Settlemyers v. Play LV Gaming Operations*, No. 09–CV–02253 RCJ GW, 2011 WL 1042569, *5 (D.Nev. Mar. 18, 2011) (dismissing a complaint where "[t]he allegation of intent to cause injury [wa]s conclusory").

Consequently, this claim must be dismissed as deficiently pled.

### · H. Whether Aliya's Constructive Trust Claim Must Be Dismissed

 "A constructive trust will arise and affect property acquisitions under circumstances where: (1) a confidential relationship exists between the parties; (2) retention of legal title by the holder thereof against another would be inequitable; and (3) the existence of such a trust is essential to the effectuation of justice." `

*Locken v. Locken*, 98 Nev. 369, 372, 650 P.2d 803 (1982). Defendants argue that this claim must be dismissed because a constructive trust is a remedy, not a cause of action. The court agrees.

The Nevada Supreme Court has expressly referred to constructive trust as a remedy. See *Bemis v. Estate of Bemis*, 114 Nev. 1021, 1027, 967 P.2d 437 (1998) ("We note that Kevin and Scott's complaint did not specifically request the remedy of a constructive trust; however, applying the Locken criteria, the remedy of constructive trust may be available notwithstanding a failure to plead fraud in the complaint" (emphasis added)). Moreover, the Nevada Supreme Court has repeatedly discussed the fact that a constructive trust is "available" based on the terms of a contract or oral agreement. See *id.* ("Having concluded that the divorce agreement created a constructive trust...."); *Locken*, 98 Nev. at 371–72, 650 P.2d 803 ("Since the record supports the finding by the district court of an oral agreement between the parties for the conveyance of land, we must first consider whether the imposition of a constructive trust runs afoul of the statute of frauds"). Numerous federal courts have dismissed constructive trust claims because a constructive trust is a remedy, not a cause of action. See *Kunio Tsutsumi v. Advanced Power Technologies, Inc.*, No. 12–CV–01784–MMD, 2013 WL 1953716, *9 (D.Nev. May 10, 2013) ("Plaintiffs' cause[ ] of action for ... constructive trust [is a] remed[y], not [an] individual cause[ ] of action.... Plaintiffs may amend their Complaint to properly plead [constructive trust] as [a] remed[y] rather than claim[ ]"); *Med. Providers Fin. Corp. II v. New Life Centers, L.L.C.*, 818 F.Supp.2d 1271, 1276 (D.Nev.2011) ("Finally, Counterclaimants' claims for an accounting and constructive trust[ ] are

**150.** *Id.*, ¶ 85.

remedies and must be dismissed with the other counterclaims"); *Cundiff v. Dollar Loan Ctr. LLC,* 726 F.Supp.2d 1232, 1242 (D.Nev.2010) ("A constructive trust is a remedy, not a cause of action. Consequently the Court will not 'dismiss' it, as it is not an independent claim"); *Hackett v. Feeney,* No. 09–CV–02075 RLH LRL, 2010 WL 1416870, *3 (D.Nev. Apr. 1, 2010) ("As a preliminary matter, the Court does not need to address Plaintiff's requests for an accounting and the imposition of a constructive trust because they are remedies, not causes of action.").[151]

Aliya cites no contrary authority. In the absence of such authority, the court finds these cases persuasive, and dismisses Aliya's constructive trust claim with prejudice. Aliya may allege constructive trust as a remedy in the prayer of any amended complaint.

### I. Whether Aliya's Breach of Contract Claim Against Exec Billing Must Be Dismissed

 Aliya's breach of contract claim against Exec Billing is actually a claim for contractual indemnity. "Contractual indemnity is where, pursuant to a contractual provision, two parties agree that one party will reimburse the other party for liability resulting from the former's work." *George L. Brown Ins. v. Star Ins. Co.,* 126 Nev. 316, 237 P.3d 92, 96 (2010) (quoting *Medallion Dev. v. Converse Consultants,* 113 Nev. 27, 33, 930 P.2d 115

(1997)), superseded by statute as stated in *Doctors Co. v. Vincent,* 120 Nev. 644, 654, 98 P.3d 681 (2004). The scope of a contractual indemnity clause is determined by the language of the contract; general principles governing the interpretation of contracts apply. *George L. Brown Ins.,* 237 P.3d at 97 (citing *Rossmoor Sanitation, Inc. v. Pylon, Inc.,* 13 Cal.3d 622, 119 Cal.Rptr. 449, 532 P.2d 97 (1975)).

Under the covenant to indemnify, Exec Billing

"agree[d] to indemnify and hold harmless [Aliya] and its successors and assigns ... for all losses, damages, liabilities and claims, and all 'fees, costs and expenses of any kind related thereto ... incurred, arising out of, based upon, or resulting from ... (b) the breach of, or failure to perform by, [CTB] of any of its agreements, covenants or obligations contained in or made pursuant to the [third] [a]greement, or the breach of, or failure to perform by, [Exec Billing] of any of its agreements, covenants or obligations contained in or made herein." [152]

 Defendants argue that the plain language of the provision requires a finding that CTB breached the third agreement before any duty to indemnify is triggered.[153] The court must agree. It is axiomatic that Exec Billing has no obligation to indemnify Aliya for damages that have not yet been awarded to it. "Nevada law has long held that ... a right of action

---

151. In *Hester v. Vision Airlines, Inc.,* 2010 WL 3724182 at *5 (D.Nev.2010), the court acknowledged that "constructive trust is an equitable remedy," but stated that it did "not dispute [ ] that a constructive trust may be an independent cause of action given the proper circumstances." *Id.* It found that the case *sub judice* was "not one such circumstance," because the class members "ha[d] other claims that may give rise to a constructive trust or money damages, which ma[de] an independent claim for a constructive trust improper." *Id.* The court's rationale for con-

cluding that a constructive trust claim *can lie* under certain circumstances is unclear. Nonetheless, as in *Hester,* Aliya can seek imposition of a constructive trust as a remedy for fraudulent inducement in an amended complaint. As a result, *Hester* does not alter the court's conclusion that the constructive trust claim should be dismissed.

152. Indemnification Agreement at 1.

153. Motion at 22–23.

.

does not accrue until the indemnitee becomes legally liable for damages." *Winnemucca Farms, Inc. v. Eckersell,* No. 05–CV–0385 RAM, 2008 WL 8943375, *6 (D.Nev. May 14, 2008) (discussing contractual indemnity and citing *Jones v. Childs,* 8 Nev. 121, 125 (1872) ("[T]he cause of action is complete when the liability is established, and therefore [ ] no actual damage or payment of the liability need be shown")); *Sanchez v. Alonso,* 96 Nev. 663, 667, 615 P.2d 934 (1980) ("This case involves an indemnification against all liabilities. Here, the indemnitee has a complete right of action when he becomes legally liable for damages").

Because CTB has not been found liable, Exec Billing has no duty to indemnify Aliya for any purported damages. Thus, it cannot at this point have breached the covenant to indemnify. As the claim is not ripe for adjudication, it must be dismissed. See *Winnemucca Farms, Inc.,* 2008 WL 8943375 at *5 (dismissing a contractual indemnity claim as not ripe based on similar allegations).[154]

### J. Whether Aliya's UCL Claim Must Be Dismissed

 Aliya alleges a UCL claim against Nickell. "The UCL prohibits 'any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising.'" *Stearns v. Select Comfort Retail Corp.,* 763 F.Supp.2d 1128, 1149 (N.D.Cal.2010) (quoting CAL. BUS. & PROF. CODE § 17200). " 'An act can be alleged to violate any or all of the three prongs of the UCL—unlawful, unfair, or fraudulent.' " *Id.* (quoting *Berryman v. Merit Prop. Mgmt., Inc.,* 152 Cal.App.4th 1544, 1554, 62 Cal.Rptr.3d 177 (2007)). The law is "sweeping, embracing anything that can properly be called a business practice and [that is] at the same time ... forbidden by law." *Cel–Tech Communications, Inc. v. L.A. Cellular Tel. Co.,* 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999); see also *Palestini v. Homecomings Fin., LLC,* No. 10CV1049–MMA, 2010 WL 3339459, *9 (S.D.Cal. Aug. 23, 2010) (same). California courts have held that "an action under the UCL is not an all-purpose substitute for a tort or contract action." *Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal.4th 1134, 1150, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003) (citations and internal quotation marks omitted).

 Defendants contend Aliya has always maintained that Nevada law governs the parties' relationship; as a result, it contends the UCL, a California statute, is inapplicable. Aliya counters that Nickell is not a party to the third agreement, or any other agreement with it, such that the choice of law provision does not apply to him. The choice of law provision in the third agreement states: "All questions concerning the performance, construction, validity and interpretation of th[e] [third] [a]greement shall be governed by the laws of the State of Nevada."[155] Aliya's UCL claim does not concern the performance,

---

**154.** The first amended complaint also alleges that Exec Billing breached the non-competition agreement "by, among other things, engaging in the business of marketing, billing and servicing drug urinalysis in direct competition with CTB and/or through entities other than CTB and not compensating Aliya for doing so." (FAC, ¶ 173.) This is the sole allegation in the complaint concerning breach of the non-competition clause. Because the allegation is conclusory, it does not plausibly plead breach. Accordingly, although not addressed by either party, this portion of the breach of contract claim must also be dismissed. See, e.g., *Aguilar v. WMC Mortgage Corp.,* No. 09–CV–01416 ECR PAL, 2010 WL 185951, *6 (D.Nev. Jan. 15, 2010) (dismissing a breach of contract claim because "[p]laintiffs' allegations [were] conclusory and vague").

**155.** Third Agreement, § 33.

construction, validity, or interpretation of the third agreement, however. It is based on Nickell's alleged violation of California Penal Code § 484, which provides:

> "Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her ... is guilty of theft." CAL. PEN. CODE § 484.

Aliya also contends Nickell's conduct constitutes embezzlement under California law. See CAL. PEN. CODE § 506 ("Every trustee, banker, merchant, broker, attorney, agent, assignee in trust, executor, administrator, or collector, or person otherwise intrusted with or having in his control property for the use of any other person, who fraudulently appropriates it to any use or purpose not in the due and lawful execution of his trust, or secretes it with a fraudulent intent to appropriate it to such use or purpose ... is guilty of embezzlement").[156] Given these allegations, the court cannot conclude that the UCL claim concerns "performance, construction, validity [or] interpretation" of the agreements. For that reason, even were Nickell, a third party, entitled to invoke the choice of law provision in the third agreement, it would not control here. See *Villelli v. R.A.V., Inc.*, No. G046045, 2012 WL 6721117, *7 (Cal.App. Dec. 28, 2012) (Unpub.Disp.) ("As Leslie concedes, 'this action is not one seeking relief concerning the validity, interpretation, and administration of [the] Trust.' Instead, this action seeks relief from third parties who allegedly coerced and fraudulently induced a cotrustee to transfer Trust property for inadequate consideration. The claims for relief turn on the propriety of the third parties' conduct, not 'the validity, interpretation, and administration' of the Trust. The Trust's choice-of-law provision therefore does not apply under these circumstances").

Defendants do not argue that application of California law would impair Nevada's interests. Because their only basis for arguing that Nevada law applies is the choice of law provision, and this argument fails, California law presumptively applies, because "California will decline to apply its own law to a case brought in California only if it is shown that another state has a greater interest in having its law applied." *Nelson v. Tiffany Industries Inc.*, 778 F.2d 533, 534 (9th Cir.1985); *In re Computer Memories Sec. Litig.*, 111 F.R.D. 675, 684–85 (N.D.Cal.1986) ("[U]nder California choice of law rules, the party seeking to invoke the law of another jurisdiction bears the burden of going forward with the argument that the foreign jurisdiction's law conflicts with the relevant California law, that both California and the foreign jurisdiction have an interest in having their own laws applied, and that the interests of the foreign jurisdiction will be more impaired than those California if its law is not applied"); *Hurtado v. Superior Court*, 11 Cal.3d 574, 581, 114 Cal.Rptr. 106, 522 P.2d 666 (1974) ("[G]enerally speaking, the forum will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state"). Thus, the court will apply California law in evaluating Aliya's UCL claim against Nickell.

Applying California law, the court concludes that Aliya's UCL claim fails because California does not permit extraterritorial application of the UCL. "California's Supreme Court has made clear that there is a strong presumption against the extra-territorial application of California law." *Ehret v. Uber Technologies, Inc.*, 68

---

156. Courts have permitted UCL claims based on violation of Penal Code § 484. See *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal. App.4th 1544, 1554, 62 Cal.Rptr.3d 177 (2007).

F.Supp.3d 1121, 1129 (N.D.Cal.2014). In *Sullivan v. Oracle Corp.*, 51 Cal.4th 1191, 127 Cal.Rptr.3d 185, 254 P.3d 237 (2011), the Court reiterated this long-held rule:

"However far the Legislature's power may theoretically extend, we presume the Legislature did not intend a statute to be 'operative, with respect to occurrences outside the state, ... unless such intention is clearly expressed or reasonably to be inferred from the language of the act or from its purpose, subject matter or history.'" *Id.* at 1207, 127 Cal. Rptr.3d 185, 254 P.3d 237 (quoting *Diamond Multimedia Systems, Inc. v. Superior Court*, 19 Cal.4th 1036, 1059, 80 Cal.Rptr.2d 828, 968 P.2d 539 (1999) (internal citation and quotation marks omitted)).

In *Sullivan*, the California Supreme Court explicitly held that this presumption applied to the UCL, noting that "[n]either the language of the UCL nor its legislative history provides any basis for concluding the Legislature intended the UCL to operate extraterritorially," and concluding that the presumption against extraterritoriality "applies to the UCL in full force." *Id.*; *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal.App.4th 214, 222, 85 Cal.Rptr.2d 18 (1999) ("[The UCL is not] applicable to claims of non-California residents injured by conduct occurring beyond California's borders"); see also *Badella v. Deniro Marketing LLC*, No. C 10–03908 CRB, 2011 WL 5358400, *11 (N.D.Cal. Nov. 4, 2011) ("[T]he Court recognizes that extraterritorial application of the UCL is improper where non-residents of California raise claims based on conduct that allegedly occurred outside of the state," citing *Sullivan v. Oracle Corp.*, 547 F.3d 1177, 1187 (9th Cir.2008)). Aliya is a Nevada resident; the first amended complaint does not allege Nickell's citizenship. Nor does it allege that any of the purportedly unlawful, unfair, or fraudulent business practices in which Nickell engaged took place in California. Absent such allegations, the court cannot conclude that it is appropriate to apply the UCL to the claim of a non-California residents such as Aliya. The claim is therefore deficient and must be dismissed.

■ Defendants also argue that the UCL claim is deficient because Aliya does not seek restitution. As noted, the type of relief that a UCL plaintiff can obtain is limited to restitution and other forms of equitable relief; "[t]o show [an entitlement] to restitution, a plaintiff must demonstrate that the defendant is in possession of money or property taken from [him or] her." See *Asghari v. Volkswagen Grp. of Am., Inc.*, 42 F.Supp.3d 1306, 1324 (C.D.Cal.2013); *Groupion, LLC v. Groupon, Inc.*, 859 F.Supp.2d 1067, 1083 (N.D.Cal.2012) (holding that restitution was unavailable because plaintiff "ha[d] not submitted any evidence or ... argument, to show that [defendant] obtained money from [plaintiff] or that [plaintiff] otherwise ha[d] any ownership interest [in] any of [defendant's] profits," citing *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App.4th 663, 699, 38 Cal.Rptr.3d 36 (2006) (a plaintiff can seek money or property as restitution only when the "money or property identified as belonging in good conscience to the plaintiff [can] clearly be traced to particular funds or property in the defendant's possession")); *Hill v. Opus Corp.*, 464 B.R. 361, 394 (C.D.Cal. 2011) (restitution is not available where the money claimed by plaintiff cannot be "traced to any particular funds in [defendants'] possession"); *EchoStar Satellite Corp. v. NDS Group PLC*, No. SA CV03–0950 DOC, 2008 WL 4596644, *9 (C.D.Cal. Oct. 15, 2008) ("Restitution under the UCL is only available where the sum at issue can clearly be traced to particular funds or property in the defendant's possession.... As the Court previously recognized, NDS never directly took anything

from EchoStar.... Simply put, it is plain that EchoStar is seeking to dress up its unsuccessful damages claim as one for restitution under the UCL. However, such relief is not available" (internal quotation marks and citations omitted)); see also *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1268, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992) (when restitution is ordered, "defendant is asked to return something he wrongfully received; he is not asked to compensate the plaintiff for injury suffered as a result of his conduct").

 The court agrees with defendants that Aliya has not alleged entitlement to restitution, because it has not plausibly pled that Nickell—as opposed to CTB—"is in possession of money or property taken from [it]." See *Asghari*, 42 F.Supp.3d at 1324. Aliya alleges that "CTB has deposited the checks [constituting payment on Aliya's receivables] into its own account and commingled Aliya's funds with its own[, and that] Nickell used the payments on Aliya's receivables to fund his other investments and businesses, and then from time-to-time, Nickell would replenish CTB's account and wire Aliya funds for collected receivables."[157] This allegation is supported by one purported example of alleged misuse by Nickell.[158] Even assuming the example is not sufficient to allege that Nickell is in possession of money that legally belongs to Aliya because the complaint concedes that "CTB eventually wired Aliya the received funds."[159] There are no other non-conclusory allegations in the complaint that indicate Nickell took receipt of funds belonging to Aliya. For this reason as well, Aliya's UCL claim against Nickell is deficient and must be dismissed.

## K. Whether the Court Should Grant Aliya Leave to Amend

Defendants argue that Aliya's complaint should be dismissed with prejudice. The court has denied defendants' motion to dismiss Aliya's fraudulent inducement, negligent misrepresentation, and conversion claims; those claims can therefore proceed. The court has granted defendants' motion to dismiss the balance of Aliya's claims, however. While Aliya has now had two opportunities to plead viable claims, this is the first opportunity the court has had to pass on the adequacy of the claims. Despite the fact that many of the claims were deficient, Aliya may be able to amend to allege plausible claims for relief. The court therefore grants Aliya leave to amend. See *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051 (9th Cir. 2008) ("Dismissal without leave to amend is proper if it is clear that the complaint could not be saved by amendment"); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1013 (9th Cir.2005) ("Dismissal without leave to amend is improper unless it is clear ... that the complaint could not be saved by any amendment"); *California ex rel. California Department of Toxic Substances Control v. Neville Chemical Co.*, 358 F.3d 661, 673 (9th Cir.2004) ("[D]enial of leave

157. FAC, ¶ 95.

158. *Id.*, ¶ 96 ("As one example of Nickell's commingling and withholding proceeds, in the beginning of 2014 he unilaterally decided to hold on to Aliya's funds for up to seven weeks before finally paying Aliya in two installments on February 27 ($515,758) and March 5 ($534,696). Based on information and belief, these dates coincide with Nickell's refinancing of a commercial building that he owns through one of his other entities (Kashiwa Court, LLC). Nickell refinanced this building in two separate transactions on February 26 and March 4, respectively, in each case the day prior to paying Aliya past overdue amounts. Nickell took the liberty to hold on to Aliya's funds at his discretion until such time that his refinance transactions had closed").

159. *Id.*, ¶ 97.

to amend is appropriate if the amendment would be futile," citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

### III. CONCLUSION

For the reasons stated, the court grants in part and denies in part defendants' motion to dismiss. The motion to dismiss Aliya's fraudulent inducement, negligent misrepresentation, and conversion claims is denied. As noted, defendants do not move to dismiss Aliya's breach of contract claim against CTB, nor its claim for an accounting; these claims will thus proceed as well. Defendants' motion to dismiss Aliya's promissory fraud claim is denied to the extent the claim is based on CTB's and Nickell's alleged promise to refund the purchase price of out-of-network receivables; the claim is dismissed, however, to the extent it is based on CTB's and Nickell's promise to set up a lockbox account. The motion to dismiss Aliya's fraudulent concealment, intentional interference with contractual relations, constructive trust, breach of contract against Exec Billing, and UCL claims is also granted. With the exception of the constructive trust claim, which is dismissed with prejudice, the court grants leave to amend. Aliya may file an amended complaint within twenty (20) days of the date of this order if it is able to remedy the deficiencies the court has noted.

Aliya may not plead new claims. Should the scope of any amendment exceed the scope of leave to amend granted by this order, the court will strike the offending portions of the pleading under Rule 12(f). See FED. R. CIV. PROC. 12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act: (1) on its own; or (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading"); see also *Barker v. Avila,* No. 2:09–cv–0001–GEB–JFM, 2010 WL 3171067, *1–2 (E.D.Cal. Aug. 11, 2010) (striking an amendment to a federal law claim where the court had granted leave to amend only state law claims).